**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JULIET EVANCHO; *et al.*,

                *Plaintiffs*,

      v.

PINE-RICHLAND SCHOOL DISTRICT; *et al.*,

                *Defendants*.

PITTSBURGH DIVISION

Civil Action No. 2:16-cv-01537-MRH

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to this Court's October 24, 2016 Order (Docket No. 30), Plaintiffs JULIET EVANCHO, ELISSA RIDENOUR, and A.S., by and through their attorneys, hereby respectfully submit the following Proposed Findings of Fact and Conclusions of Law in support of Plaintiffs' Motion for Preliminary Injunction (Docket No. 24).

## FINDINGS OF FACT

### Sex, Gender Identity, and Gender Dysphoria

1.      A person's sex is determined by multiple factors, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. Decl. of Diane Ehrensaft, Ph.D. ("Ehrensaft Decl.") ¶¶ 18, 20. These factors may not always be in alignment. *Id.* at ¶ 18.

2.      Gender identity—a person's internal sense of their own gender—is the primary factor in determining a person's sex. Ehrensaft Decl. at ¶¶ 18, 19.

3.      Gender identity is a deeply felt and core component of human identity. Ehrensaft Decl. at ¶ 19. Every person has a gender identity. *Id.* at ¶ 20.

4.     Children become aware of their gender identity between the ages of two and four. Ehrensaft Decl. ¶ 23. Gender identity is innate and efforts to change a person's gender identity are unethical and harmful to a person's health and well-being. *Id.* at ¶¶ 21-22, 31.

5.     The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. Ehrensaft Decl. at ¶¶ 17, 37. Typically, individuals are assigned a sex on their birth certificate solely on the basis of the appearance of external genitalia at the time of birth. ¶ 17.

6.     A transgender person is someone whose gender identity diverges from the person's sex assigned at birth. Ehrensaft Decl. at ¶¶ 17, 20. A cisgender person is someone whose gender identity aligns with the sex they were assigned at birth. *Id.* at ¶ 20.

7.     Gender dysphoria is a serious medical condition that refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. Ehrensaft Decl. at ¶ 24.

8.     Treatment for gender dysphoria typically includes a "social transition" during which transgender individuals live in accordance with their gender identity in all aspects of life, including the use of sex-designated facilities that correspond to that gender. Ehrensaft Decl. ¶ 27.

9.     Social transition can often be the most important and only aspect of transition for a transgender person. Ehrensaft Decl. at ¶ 30.

10.     Social transitioning requires that a transgender girl be recognized as a girl and treated the same as all other girls by parents, teachers, classmates and others in the community. Ehrensaft Decl. at ¶¶ 27, 32. Social transitioning also requires that a transgender boy be recognized as a boy and treated the same as all other boys by parents, teachers, classmates and others in the community. *Id.*

11.     To be effective, social transitioning must include being permitted to use restrooms and other sex-designated facilities on the same footing as other students of the same gender. Ehrensaft Decl. at ¶¶ 32, 33, 38.

**<u>Plaintiffs</u>**

12.     Plaintiffs Juliet Evancho, Elissa Ridenour, and A.S. are senior students at Pine-Richland High School in Gibsonia, Pennsylvania.  Decl. of Juliet Evancho ¶ 4 ("Juliet Decl."); Decl. of Elissa Ridenour ¶ 5 ("Elissa Decl."); Decl. of A.S. ¶¶ 4, 9 ("A.S. Decl."); Decl. of Glenn Ridenour ¶¶ 3, 11 ("G. Ridenour Decl."); Decl. of Michael J. Evancho ¶¶ 7, 10 ("M. Evancho Decl.").

13.     Plaintiffs Juliet Evancho and Elissa Ridenour are girls.  Like cisgender girls at Pine-Richland High School, Juliet and Elissa have a female gender identity. Juliet Decl. ¶ 2; Elissa Decl. ¶ 2. They are widely known and accepted as girls by the Pine-Richland school community. Juliet Decl. ¶¶ 33, 56; Elissa Decl. ¶¶ 20, 39.

14.     Plaintiff A.S. is a boy.  A.S., like cisgender boys at Pine-Richland High School, has a male gender identity. A.S. Decl. ¶ 2. He is widely known and accepted as a boy by the Pine-Richland school community. A.S. Decl. ¶ 25.

15.     Plaintiffs Juliet Evancho, Elissa Ridenour, and A.S. are transgender. Juliet Decl. ¶ 8; Elissa Decl. ¶ 9; A.S. Decl. ¶ 9; G. Ridenour Decl. ¶ 3; M. Evancho Decl. ¶ 7. Plaintiff Juliet Evancho has also been diagnosed with gender dysphoria. Juliet Decl. ¶ 27; M. Evancho Decl. ¶ 8.

16.     Plaintiffs socially transitioned at school at different points in their lives. Juliet Decl. ¶¶ 29-31; Elissa Decl. ¶ 18; A.S. Decl. ¶¶ 9-10, 15; G. Ridenour's Decl. ¶¶ 12-13; M. Evancho's Decl. ¶¶ 11-12.

17.     Plaintiff Elissa Ridenour has been widely known and accepted as a girl by the Pine-Richland School District ("PRSD") community since eighth grade. Elissa Decl. ¶¶ 18, 20, 23, 39; G. Ridenour Decl. ¶ 12. She has been referred to by her female pronouns and, until Defendants' adoption and implementation of Resolution 2 and PRSD's new policy and practice, used the girls' restroom her entire tenure at Pine-Richland High School. Elissa Decl. ¶¶ 21, 23, 39.

18.     Plaintiff Juliet Evancho socially transitioned during the summer before her junior year. Juliet's Decl. ¶¶ 30-31; M. Evancho Decl. ¶¶ 11-12. Since the beginning of her junior year, Juliet has been widely known and accepted as a girl by the Pine-Richland school community. Juliet Decl. ¶ 33; M. Evancho Decl. ¶ 12. Until Defendants' adoption and implementation of Resolution 2 and PRSD's new policy and practice, Juliet used the girls' restrooms. Juliet's Decl. ¶ 33.

19.     Plaintiff A.S. began to socially transition at school during his sophomore year. A.S. Decl. ¶¶ 9-10. Since his junior year, A.S. has been widely known and accepted as a boy by the Pine-Richland school community. *Id.* at ¶ 25. Until Defendants' adoption and implementation of Resolution 2 and PRSD's new policy and practice, A.S. used the boys' restrooms. *Id.* at ¶ 22.

**Defendants**

20.     Defendant PRSD is a public school district serving over 4,600 students in kindergarten through 12th grade who reside in the Pine and Richland townships of Pennsylvania. It is organized under the laws and constitution of the Commonwealth of Pennsylvania. PRSD operates four elementary schools, Pine-Richland Middle School, and Pine-Richland High School.

21.     PRSD is governed by the Board of School Directors of Pine-Richland School District (the "School Board"), a nine-member elected body that sets policy for PRSD and delegates responsibility for the administration of PRSD to its Superintendent of Schools, who oversees a number of district-level administrators.

4

22.     PRSD is a recipient of federal financial assistance. DE 23-3 at 5; DE 23-4 at 3, 5.[1]

23.     Defendant Superintendent Brian R. Miller is the current Superintendent of PRSD. At all times relevant to the events at issue in the case at bar, Superintendent Miller acted within the scope of his employment as an employee, agent, and representative of the School Board. In such capacity, he implemented Resolution 2 and PRSD's new policy and practice described herein at the direction of, and with the consent, encouragement, knowledge, and ratification of the School Board; under the School Board's authority, control, and supervision; and with the actual or apparent authority of the School Board.

24.     Superintendent Miller has final policymaking authority for PRSD in circumstances not otherwise provided for in the School District Bylaws and Policies.

25.     Defendant Principal Nancy Bowman is the current Principal of Pine-Richland High School. At all relevant times relevant to the events at issue in the case at bar, Principal Bowman acted within the scope of her employment as an employee, agent, and representative of the School Board. In such capacity, she implemented at Pine-Richland High School Resolution 2 and PRSD's new policy and practice described at the direction of, and with the consent, encouragement, knowledge, and ratification of the School Board; under the School Board's authority, control, and supervision; and with the actual or apparent authority of the School Board.

26.     Principal Bowman has final policymaking authority for Pine-Richland High School with respect to the day-to-day enforcement of PRSD's policies, including disciplinary policies and the newly adopted discriminatory policy and practice described herein at Pine-Richland High School.

---

[1]  Except where otherwise specified, "DE 23-__" refers to the docket entry number for an exhibit to the Declaration of Omar Gonzalez-Pagan in Support of Plaintiffs' Motion for Preliminary Injunction (Docket No. 23).

**PRSD's Policies and Practices Pertaining to the Use of Restrooms and Other Sex-Designated Facilities.**

27.     For several years, PRSD's longstanding practice was to provide transgender students access to the restrooms consistent with their gender identity. Juliet Decl. ¶¶ 31, 41; Elissa Decl. ¶¶ 21, 29; A.S. Decl. ¶¶ 22, 24, 28; M. Evancho Decl. ¶¶ 16, 19; G. Ridenour Decl. ¶¶ 15, 17-20, 34; DE 23-23 at 2; DE 23-3 at 5; DE 23-5 at 35 ("The factual status quo here is that you've had at least two transgender female [students] . . . using girls' restrooms. That is the factual status quo.") (School Solicitor Patrick Clair, at August 8, 2016 Pine-Richland School Board meeting).

28.     On March 11, 2016, Superintendent Miller emailed parents and guardians of PRSD students noting that there were transgender students at Pine-Richland and that PRSD had not previously communicated about the topic based on the strong desire to maintain the confidentiality of individual students and that the U.S. Department of Education ("ED") Office of Civil Rights had "taken a consistent stance that gender identity and expression are included in the terms [sex or gender] under Title IX that prohibits sex discrimination in schools." DE 23-23 at 1.

29.     In his email, Superintendent Miller described PRSD's longstanding inclusive practice with respect to restrooms as follows:

> In our high school, transgender students have been able to use a private bathroom, such as the nurse's office, a single room unisex bathroom, or the bathroom of their gender identity. This has occurred for several years. To date, we are not aware of any inappropriate actions on the part of any student. The option also exists for any student to use a single stall bathroom.

DE 23-23 at 2; *see also* DE 23-3 at 3.

30.     On September 12, 2016, following months of debate regarding the use of restrooms by transgender students, the School Board adopted Resolution 2, which reversed PRSD's longstanding inclusive practice. DE 23-6 at 41.

31.     Resolution 2 read, in whole:

This resolution agreed to by a majority of the Board of Directors of the Pine-Richland School District indicates our support to return to the long-standing practice of providing sex specific facility usage. All students will have the choice of using either the facilities that correspond to their biological sex or unisex facilities. This practice will remain in place until such time that a policy may be developed and approved.

DE 23-1.

32.     By using the term "biological sex"—which by Defendants' definition is meant to refer to the sex assigned to an individual at birth or "anatomical sex"—Resolution 2 excludes transgender individuals like Plaintiffs from multi-user restrooms and other facilities consistent with their gender identity because their birth-assigned sex does not match their gender identity. DE 23-4 at 4 ("[M]y intent of this resolution is that biological, anatomical sex is what this stands for. Essentially for lack of a better term, your sex assigned at birth is what I'm referring to in this resolution.") (Greg DiTullio, at July 11, 2016 Pine-Richland School Board meeting).

33.     On September 13, 2016, Defendants implemented Resolution 2 by barring transgender students from using the restrooms and other sex-designated spaces consistent with their gender identity and by mandating that transgender students utilize the restrooms that are not consistent with their gender identity or use single-stall unisex restrooms ("PRSD's new policy and practice"). Juliet Decl. ¶¶ 44-45; Elissa Decl. ¶¶ 32-33; A.S. Decl. ¶¶ 29-32; M. Evancho Decl. ¶¶ 20-21, 23; Ex. 1 to M. Evancho Decl. ¶ 27; G. Ridenour Decl. ¶¶ 35, 37.

34.     On September 14, 2016, Defendants informed Plaintiffs that they would not delay implementation of Resolution 2 through PRSD's new policy and practice, and that Plaintiffs would be disciplined should they use the restrooms that are consistent with their gender identity. DE 23-16; *see also* M. Evancho Decl. ¶ 30.

7

35.     As a result of Defendants' implementation of Resolution 2 through PRSD's new policy and practice, Plaintiffs, unlike cisgender students, are not permitted to use restrooms consistent with their gender identity. Juliet Decl. ¶¶ 44-45; Elissa Decl. ¶¶ 32-33; A.S. Decl. ¶ 32; M. Evancho Decl. ¶ 23; G. Ridenour Decl. ¶¶ 34-35, 37; DE 23-16.

**The Effects of Resolution 2 and PRSD's New Policy and Practice on Plaintiffs.**

36.     By adopting Resolution 2, enforced through PRSD's new policy and practice, Defendants have caused and continue to cause irreparable harm to Plaintiffs.

37.     Defendants' actions have caused and continue to cause Plaintiffs to suffer from distress, anxiety, discomfort, depression, and humiliation. Juliet's Decl. ¶¶ 46-52, 55, 62; Elissa Decl. ¶¶ 28, 31, 34, 40; A.S. Decl. ¶¶ 24, 33-35, 40; G. Ridenour Decl. ¶¶ 39, 44; M. Evancho Decl. ¶¶ 18, 32, 35; *see also* Ehrensaft Decl. ¶¶ 32-35, 37, 38; DE 23-10 at 10-12.

38.     The emotional distress and symptoms of gender dysphoria, including depression, anxiety, and suicidal ideation, surge significantly in transgender students when they are instructed not to use the restrooms consistent with their gender identity and after each instance in which school personnel fail to respect their gender identity. Ehrensaft Decl. ¶¶ 33-36; *see also* DE 23-10 at 10-12.

39.     As a result of Defendants' adoption of Resolution 2, enforced through PRSD's new policy and practice, Plaintiffs feel increasingly isolated, marginalized, and stigmatized. Juliet Decl. ¶¶ 46, 49, 62; Elissa Decl. ¶¶ 36-37, 40; A.S. Decl. ¶ 35.

40.     Plaintiffs live in constant fear of being stigmatized for using a restroom that is not consistent with their gender identity and being referred to by their  birth names and pronouns— which could lead to involuntary and consistent disclosure of their transgender status to others, harassment, or even violence. Juliet Decl. ¶ 58; Elissa Decl. ¶ 35; A.S. Decl. ¶ 35.

41.     PRSD's requirement that Plaintiffs use sex-designated restrooms that are not consistent with their gender identity causes them discomfort, anxiety, and distress. Juliet Decl. ¶¶ 46-48; Elissa Decl. ¶ 35; A.S. Decl. ¶ 34; *see also* Ehrensaft Decl. ¶¶ 33, 37, 38. It also exposes them to actual and/or future violence and harassment. Juliet Decl. ¶¶ 48, 51-52, 58; Elissa Decl. ¶ 35; A.S. Decl. ¶ 34, 38-39.

42.     By compelling Plaintiffs to use single-stall unisex restrooms while not requiring it of cisgender students, PRSD marginalizes Plaintiffs and stigmatizes Plaintiffs. Juliet Decl. ¶ 49; Elissa Decl. ¶¶ 36-37; A.S. Decl. ¶ 35; M. Evancho Decl. ¶ 25; G. Ridenour Decl. ¶ 44. PRSD's actions not only cause Plaintiffs to feel isolated, but also continuously threaten to disclose their gender identity and out them as transgender. Juliet Decl. ¶ 49; Elissa Decl. ¶¶ 36-37; A.S. Decl. ¶ 35; M. Evancho Decl. ¶ 25; G. Ridenour Decl.¶¶ 40, 42.

43.     Because of the anxiety and distress caused by Resolution 2 and PRSD's new policy and practice, Plaintiffs avoid using the restroom at all while at school except when absolutely necessary. This causes them great physical discomfort. Juliet Decl. ¶ 50; Elissa Decl. ¶ 38; A.S. Decl. ¶ 36.

44.     Avoiding regular restroom use can have adverse health consequences. Ehrensaft Decl. ¶ 38; DE 23-10 at 10-12.

45.     By adopting Resolution 2, as enforced by PRSD's new policy and practice, Defendants have caused a noticeable deterioration in the school climate, which was once accepting of transgender students, but which now permits prejudice and discrimination. This shift has caused Plaintiffs to fear for their safety and well-being. Juliet Decl. ¶¶ 40, 52-53, 58; A.S. Decl. ¶¶ 38-39; M. Evancho Decl. ¶¶ 24, 28-29; *see also* Ehrensaft Decl. ¶¶ 37-38; DE 23-10 at 9-10.

46.     Defendants' actions have negatively affected Plaintiffs' schoolwork, just as they are in the process of deciding whether and where to go to college. Juliet Decl. ¶ 59; A.S. Decl. ¶¶ 30, 37.

**Defendants' Acted Fully Knowing Their Actions Violated the Law and Would Harm Plaintiffs.**

47.     Defendants adopted Resolution 2 and implemented PRSD's new policy and practice with full knowledge that they were in violation of Title IX. DE 23-4 at 5-10; DE 23-6 at 13 ("Certainly an individual plaintiff could file suit on the basis that sex in Title IX does include identity."); DE 23-22 at 2-5.

48.     Defendants acted knowing that their actions could be in violation of the United States Constitution's guarantee of equal protection. DE 23-4 at 8.

49.     The School Board voted for Resolution 2 even when it ran counter to the professional opinion of PRSD administrators, like Superintendent Miller. DE 23-3 at 5; DE 23-6 at 25. Counsel for Plaintiffs alerted Defendants of the risks posed by the institution of discriminatory practices and the importance of social transitioning for transgender students. *See* DE 23-22 at 8.

50.     Defendants adopted Resolution 2 and implemented PRSD's new policy and practice with full knowledge that the adoption of such a policy would harm Plaintiffs and other transgender students by endangering their health, safety, and well-being. On April 21, 2016, Defendants also heard from a panel of experts from Children's Hospital of Pittsburgh of UPMC, who provided background knowledge about transgender youth from medical, social, and psychological perspectives. DE 23-2 at 1-2; DE 23-15. The Pittsburgh Children's Hospital experts also noted that some of the major health challenges faced by transgender youth are, *inter alia*, a lack of acceptance of their gender identity by family, peers, and schools; not being allowed to

10

express their true gender identity; and bullying and victimization from peers, caregivers, and others. DE 23-7 at 21.

51.     Defendants were fully aware that their actions contravened the policies and practices for supporting transgender students recommended by ED's Office of Safe and Healthy Students. DE 23-9.

## CONCLUSIONS OF LAW

**Plaintiffs are likely to succeed on their statutory and constitutional claims.**

Title IX

1.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

2.     Title IX's prohibition on sex discrimination extends to "any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient of federal funding." 34 C.F.R. § 106.31.

3.     Defendant PRSD is an education program receiving federal financial assistance and is therefore subject to Title IX's prohibition of sex discrimination against any student.

4.     Under Title IX, discrimination "on the basis of sex" encompasses discrimination based on an individual's gender identity, transgender status, and gender expression, including nonconformity to sex-or gender-based stereotypes.

5.     By adopting Resolution 2, as implemented by PRSD's new policy and practice, Defendants have discriminated on the basis of sex.

6.     The "weight of circuit authority" has recognized that "discrimination based on transgender status is already prohibited by the language of federal civil rights statutes, as

interpreted by the Supreme Court." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 727 (4th Cir. 2016) (Davis, J., concurring), *cert. granted sub nom. Gloucester Cty. Sch. Bd. v. G.G.*, --- S. Ct. ----, 2016 WL 4565643 (Oct. 28, 2016).

7.      Discrimination against transgender individuals is inherently rooted in sex stereotypes and accordingly triggers heightened scrutiny on that basis.

8.      By definition, a transgender person's gender identity does not conform to societal gender stereotypes associated with a person's sex assigned at birth. *See Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000).

9.      Resolution 2, and the policy and practice enforcing it, codify sex stereotypes by banishing those whose gender identities do not match their birth-assigned sex from the facilities that others are permitted to use. That exclusion is based on sex stereotypes. *See Lusardi v. McHugh*, EEOC No. 0120133395, 2015 WL 1607756, at *9 (EEOC Apr. 1, 2015) (employer's policy banning a transgender woman from the women's facilities was discrimination because of sex).

10.     A policy that discriminates against people because their birth-assigned sex and gender identity do not match necessarily is discriminating based on sex.

11.     It is beyond dispute that sex has been taken into account in passing Resolution 2. In analyzing whether sex has been taken into account, the proper inquiry is whether the discrimination at issue is in any way related to sex. *See Schwenk*, 204 F.3d at 1202; *Smith v. Virginia Commonw. Univ.*, 84 F.3d 672, 676 (4th Cir. 1996). *Accord Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526-27 (D. Conn. 2016).

12.     Gender identity is a critical determinant of sex itself. *See, e.g.*, *G.G.*, 822 F.3d at 730 (recognizing that the "the term 'sex' means a person's gender identity") (Niemeyer, J., dissenting); *Schwenk*, 204 F.3d at 1201-02 (holding that conduct motivated by an individual's

"gender or sexual identity" is because of "gender," which is interchangeable with "sex"); *Roberts v. Clark Cty Sch. Dist.*, 2016 WL 5843046, *6 (D. Nev. Oct. 4, 2016); *Fabian*, 172 F. Supp. 3d at 526-27; *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Rumble v. Fairview Health Services*, 2015 WL 1197415 at *2 (D. Minn. Mar. 16, 2015); *see also* Ehrensaft Decl. ¶ 18. Discrimination based on gender identity is thus literally sex discrimination.

13.     Because Resolution 2 and PRSD's new policy and practice distinguishes between transgender individuals and cisgender individuals, they unlawfully discriminate on the basis of sex because they allow people to be treated consistent with their gender identity only if that identity is consistent with their sex assigned at birth.

14.     In addition, discrimination based on gender transition is necessarily based on sex, just as discrimination based on religious conversion is necessarily based on religion. For example, firing an employee because she converts from Christianity to Judaism constitutes unlawful discrimination "because of religion." *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008); *accord Fabian*, 172 F. Supp. 3d at 526-27; *Macy v. Holder*, No. 0120120821, 2012 WL 1435995, *11 (EEOC Apr. 20, 2012).

15.     A policy or practice that treats men and women equally as a general matter but nonetheless discriminates against those who undertake gender transition or who do not "complete" gender transition constitutes discrimination on the because of DE 23-6or example, if a student is a girl, lives openly as a girl, and has taken medical steps (including hormone therapy) to affirm her female identity, a school's policy, such as Resolution 2 here, would reflect a determination that the student's gender transition is not yet finished and so she is not "really" a girl until she obtains surgical treatment and updates her birth certificate.

13

16.     By defining the proper terms of gender transition and therefore writing into law what it means to be a "real" man or "real" woman, policies like Resolution 2 discriminate based on sex.

17.     Title IX requires schools to provide transgender students access to restrooms that are consistent with their gender identity because access to the bathroom is an education program or activity under Title IX. *Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*, --- F. Supp. 3d ---, 2016 WL 5372349, *10 (S.D. Ohio Sept. 26, 2016).

18.     For purposes of Title IX, ED and U.S. Department of Justice ("DOJ") have made clear that schools must treat a student's gender identity as the student's sex. DE 23-8 at 2.

19.     Over the past several years, ED has issued several guidance documents explaining the agency's interpretation of Title IX and its implementing regulations with respect to transgender students. DE 23-18 at 8; DE 23-19 at 5; DE 23-20 at 25; DE 23-21 at 2.

20.     Thus, schools cannot treat transgender students differently from the way they treat other students of the same gender identity. DE 23-8 at 2. When schools provide sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity. *Id.* at 3.

21.     By barring Plaintiffs from the restrooms consistent with their gender identity, Defendants have discriminated against Plaintiffs on the basis of sex. *See G.G.*, 822 F.3d at 718.

22.     Although regulations concerning Title IX include an exception to the statute's general prohibition on discrimination based on sex in that they permit schools to have separate toilet, locker rooms, and shower facilities on the basis of sex, such exception does not permit the exclusion of transgender students from the restrooms congruent with their gender identity, particularly in light of ED's interpretation of 34 C.F.R. § 106.33. *See G.G.*, 822 F.3d at 715, 718.

23.     ED's unequivocal interpretation of its own regulation as not permitting discrimination against transgender individuals through such exclusions is reasonable, reflects the agency's fair and considered judgment, and is entitled to controlling weight under *Auer v. Robbins*, 519 U.S. 452, 461 (1997). *See G.G.*, 822 F.3d at 720; *Highland Loc. Sch. Dist.*, 2016 WL 5372349 at *10-13.

24.     By adopting and enforcing a policy or practice prohibiting Juliet, a transgender girl, from accessing and using female-designated restrooms at school, and requiring that she use male-designated restrooms or single-occupancy restrooms, Defendant PRSD discriminated against and continues to discriminate against Juliet in her enjoyment of PRSD's educational programs and activities by treating her differently from other female students based on her gender identity, the fact that she is transgender, and her nonconformity with sex stereotypes.

25.     Defendant PRSD has discriminated against Juliet on the basis of sex in violation of Title IX and has thereby denied Juliet the full and equal participation in, benefits of, and right to be free from discrimination in the educational opportunities offered by PRSD and Pine-Richland High School.

26.     By adopting and enforcing a policy or practice prohibiting Elissa, a transgender girl, from accessing and using female-designated restrooms at school, and requiring that she use male-designated restrooms or single-occupancy restrooms, Defendant PRSD discriminated against and continues to discriminate against Elissa in her enjoyment of PRSD's educational programs and activities by treating her differently from other female students based on her gender identity, the fact that she is transgender, and her nonconformity with sex stereotypes.

27.     Defendant PRSD has discriminated against Elissa on the basis of sex in violation of Title IX and has thereby denied Juliet the full and equal participation in, benefits of, and right

to be free from discrimination in the educational opportunities offered by PRSD and Pine-Richland High School.

28.     By adopting and enforcing a policy or practice prohibiting A.S., a transgender boy, from accessing and using male-designated restrooms at school, and requiring that he use female-designated restrooms or single-occupancy restrooms, Defendant PRSD has discriminated against and continues to discriminate against A.S. in his enjoyment of PRSD's educational programs and activities by treating him differently from other male students based on his gender identity, the fact that he is transgender, and his nonconformity with sex stereotypes.

29.     Defendant PRSD has discriminated against A.S. on the basis of sex in violation of Title IX and thereby has denied A.S. the full and equal participation in, right to be free from discrimination in, and benefits of educational opportunities offered by PRSD and Pine-Richland High School.

30.     PRSD has intentionally violated Title IX.

31.     Resolution 2 and PRSD's new policy and practice impose a host of irreparable harms upon Plaintiffs, including distress, stigma, anxiety, depression, decreased academic performance, and possible disciplinary actions—all during their irreplaceable senior year of high school.

Equal Protection

32.     Resolution 2 and PRSD's new policy and practice facially discriminate against transgender students in violation of the equal protection guarantee of the Fourteenth Amendment. *See Highland Loc. Sch. Dist.*, 2016 WL 5372349, at *19.

33.     In the first instance, Resolution 2 and PRSD's new policy and practice discriminate on the basis sex.  Discrimination on the basis of sex necessarily encompasses discrimination based

on an individual's gender identity, transgender status, and gender expression, including nonconformity to sex-or gender-based stereotypes.

34.     Excluding transgender individuals from restrooms congruent with their gender identity constitutes government action on the basis of sex. *See G.G.*, 822 F.3d at 727; *Highland Loc. Sch. Dist.*, 2016 WL 5372349, at *13 ("Jane has been denied access to the communal girls' restroom 'on the basis of [her] sex.'").

35.     Because Resolution 2 excludes transgender students from facilities congruent with their gender identity, and because it relies on "biological sex," it is a sex-based classification.

36.     Gender-based classifications warrant heightened scrutiny. *See United States v. Virginia*, 518 U.S. 515, 555 (1996) (internal quotation marks omitted).

37.     Resolution 2 and PRSD's new policy and practice separately also trigger heightened scrutiny because they discriminate on the basis of transgender status. *See Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (S.D.N.Y. 2015); *Highland Loc. Sch. Dist.*, 2016 WL 5372349, at *15-17; *Norsworthy*, 87 F. Supp. 3d at 1119.

38.     In identifying whether a classification triggers heightened scrutiny, courts consider whether: (a) the class has historically been subjected to discrimination, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (b) the class's defining characteristic bears a relation to the ability to perform or contribute to society, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985); (c) the class exhibits an obvious, immutable, or sufficiently discernible characteristic to define them as a discrete group, *Bowen*, 483 U.S. at 602; *Windsor v. United States*, 699 F.3d 169, 183 (2d Cir. 2012); and (d) the class is a minority or politically powerless, *Bowen*, 483 U.S. at 602.

39.     While not all four factors must be met to warrant heightened scrutiny, *see Windsor*, 699 F.3d at 181; *Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012), all

four point in favor of heightened scrutiny with respect to laws that classify on the basis of transgender status. *Adkins*, 143 F. Supp. 3d at 139-40.

40.    Transgender people have experienced a long history of discrimination, including pervasive discrimination in employment, housing, and access to places of public accommodation or government services. *See Adkins*, 143 F. Supp. 3d at 139; *Highland Loc. Sch. Dist.*, 2016 WL 5372349, at *16; *Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014) ("[t]he hostility and discrimination that transgender individuals face in our society today is well-documented"); *see also* DE 23-12 at 7 ("It is part of social and legal convention in the United States to discriminate against, ridicule, and abuse transgender and gender non-conforming people within foundational institutions such as the family, schools, the workplace and health care settings, every day.").

41.    There is also no relationship between transgender status and the ability to contribute to society. *Highland Loc. Sch. Dist.*, 2016 WL 5372349, at *16.

42.    Transgender individuals are a discrete minority—it is estimated that only 0.6% of the adults in the United States identify as transgender, DE 23-13 at 2—and there can be little dispute that they are relatively powerless politically.

43.    Further, a person's gender identity is a sufficiently discernible characteristic that is innate and effectively immutable in that it cannot be altered or be expected to change. *See* Ehrensaft Decl. ¶¶ 20-22, 31; *Highland Loc. Sch. Dist.*, 2016 WL 5372349, at *16; *see also Hernandez-Montiel, v. Immigr. & Naturalization Serv.*, 225 F.3d 1084, 1093 (9th Cir. 2000).

44.    Resolution 2's class-based targeting of Plaintiffs demands meaningful review, as discrimination based on both sex and transgender status.

45. All sex classifications must be evaluated under heightened scrutiny even when they are based on alleged biological differences between men and women. *See Tuan Anh Nguyen v. Immigr. & Naturalization Serv.*, 533 U.S. 53, 73 (2001).

46. Under heightened scrutiny, the State must show that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives—a burden of justification that is demanding and rests entirely on the State. *See Virginia*, 518 U.S. at 533. The State's justifications must be genuine, not hypothesized or invented *post hoc* in response to litigation, and must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females. *Id.* As such, the constitutionality of the challenged classification must be judged based on the actual purpose of the classification, not on rationalizations for actions in fact differently grounded. *Id.* at 535-36.

47. And indeed, courts must insist on knowing the relation between a classification and its purported justification even in the most ordinary equal protection cases calling for the most deferential of standards. *See Romer v. Evans*, 517 U.S. 620, 632 (1996).  The justifications offered must be grounded in the realities of the subject addressed by the legislation. *See Heller v. Doe*, 509 U.S. 312, 321 (1993). Close scrutiny requires Defendants to demonstrate that the challenged actions constitute meaningful steps towards solving a real, not fanciful problem. *See Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 849 (4th Cir. 1998); *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) ("The state must specifically identify an 'actual problem' in need of solving.").

48. Resolution 2 and PRSD's new policy and practice cannot meet these tests.

49.     Defendants have no legitimate reason to treat Plaintiffs differently from their cisgender peers.

50.     Plaintiffs' unremarkable and uneventful use of the restrooms consistent with their gender identity for months, even years, without any incident is the best evidence that Defendants' decision to bar them from those same restrooms later was purely arbitrary and based on discriminatory motives.

51.     Defendants appear to have primarily based Resolution 2 on a purported interest to protect "bodily privacy," DE 23-2 at 4, meaning the interest of all students in not having their unclothed bodies observed by another person. Although the protection of students' privacy is a legitimate interest, in the circumstances presented here, Defendants cannot show that the fit between the means and the important end is "'exceedingly persuasive.'" *Nguyen*, 533 U.S. at 70 (quoting *Virginia*, 518 U.S. at 533).

52.     Plaintiffs have the same interest in privacy as other cisgender students, and there is no basis for Defendants to conclude that allowing Plaintiffs to access the restrooms consistent with their gender identity would violate any student's privacy.

53.     To the extent that Defendants argue that they are protecting students' privacy interest in not being observed or exposed to another student of a different sex, such argument is wholly without merit. *See Highland Loc.l Sch. Dist.*, 2016 WL 5372349, at *17; *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, Slip Copy, 2016 WL 5239829, *4 (E.D. Wis. Sept. 22, 2016) ("The defendants argue that students have a right to privacy; the court is not clear how allowing the plaintiff to use the boys' restroom violates other students' right to privacy.").

54.     A contention about the physical differences between Plaintiffs and cisgender students of the same gender identity do not justify Defendants' actions in barring Plaintiffs from

shared restrooms and singling them out from their peers. Although physiological differences between the sexes in some cases may permit differential treatment in the achievement of an important objective, such differences cannot be used to mask discrimination that is unlawful or is otherwise based on gender stereotypes. *See Nguyen*, 533 U.S. at 64, 68.

55.     The notion that the presence of Plaintiffs, who are transgender, in areas of restrooms consistent with their gender identity and where all students are fully clothed would somehow invade the bodily privacy of other students in a way that the presence of cisgender students of the *same* gender identity in those very same areas would not is incorrect.[2] Such notion is not only based on groundless speculation, it is also one of the "overbroad generalizations" and gender-based assumptions about individuals that the Supreme Court has held cannot justify sex discrimination. *Virginia*, 518 U.S. at 533.

56.     From a medical and scientific perspective, the most important determinants of a person's sex are neurological sex and gender identity, not external physical characteristics. *See* Ehrensaft Decl. ¶ 18. Unlike cisgender students with their same gender identity, however, Elissa, Juliet, and A.S. are not permitted to use restrooms consistent with their gender identity. Juliet Decl. ¶¶ 44-45; Elissa Decl. ¶¶ 32-33; A.S. Decl. ¶ 32; M. Evancho Decl. ¶ 23; G. Ridenour Decl. ¶¶ 34-35, 37; DE 23-16.

57.     In addition, privacy can be preserved without resorting to discrimination against transgender individuals. As a threshold issue, a purported concern for bodily exposure has no

---

[2] On October 18, 2016, a magistrate judge recommended the denial of preliminary injunctive relief to a group challenging a school's practice of allowing transgender students to use the sex-designated facilities consistent with their gender identity. *See* Report and Recommendation, *Students and Parents for Priv. v. U.S. Dept. of Educ.*, No. 16 C 4945 (N.D. Ill. Oct. 18, 2016) (ECF No. 134) (DE 23-24). In doing so, the court found that the plaintiffs had not shown a likelihood of success on the merits of their claim that District 211 or the Federal Defendants were violating their right to privacy or Title IX "because transgender students are permitted to use restrooms consistent with their gender identity." *Id.* at 4.

footing in the restroom context, given the divided and enclosed nature of restroom stalls, and the existence and availability of privacy dividers for urinals.

58.     Resolution 2 also fails to promote privacy, even on its own terms. Resolution 2 and PRSD's new policy and practice continually invade transgender students' own interest in bodily privacy, stigmatizing them and exposing them to their peers as different. *See* DE 23-10 at 12 ("Such discrimination can also undermine transgender students' right to privacy, by effectively outing them as transgender to peers and school staff."). The physiological differences upon which Defendants rely to justify their exclusionary and discriminatory actions do not advance any interest in protecting students' bodily privacy. To the contrary, Resolution 2 and Defendants' actions actually undermine any interest in protecting students' privacy by making Plaintiffs' physiological features the subject of unwanted attention.

59.     The fact that transgender students at PRSD, including Plaintiffs have been able to use the restrooms consistent with their gender identity "for several years," DE 23-23 at 2, before the discriminatory actions at issue here completely undermines any assertion that Plaintiffs' use of the restrooms consistent with their gender identity would violate other students' privacy. *See Whitaker*, 2016 WL 5239829, at *6 ("The evidence before the court indicates that Ash used the boys' restroom for some seven months without incident or notice . . . This evidence contradicts the defendants' assertions that allowing Ash to use the boys' restroom would violate other students' privacy rights.").

60.     Generalized concerns about safety cannot justify Resolution 2 or PRSD's new policy and practice.

61.     There is no evidence that excluding Plaintiffs from the restrooms consistent with their gender identity implicates any safety concerns.

62.     Defendants have admitted that transgender students have been able to use the restrooms consistent with their gender identity "for several years" and that they "are not aware of any inappropriate actions on the part of any student." DE 23-23 at 2. *See Highland Loc. Sch. Dist.,* 2016 WL 5372349, at *18 (noting that school district's "justifications of safety and lewdness concerns" were insufficient because "no incidents of individuals using an inclusive policy to gain access to sex-segregated facilities for an improper purpose have ever occurred").

63.     Without a basis for Defendants' safety concerns, it is evident that Defendants simply acted based on "nightmare speculation." *Exodus Refugee Immigr., Inc. v. Pence*, 2016 WL 5682711, at *1 (7th Cir. Oct. 3, 2016). Accordingly, this Court rejects the resort to such baseless fears. *Cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313-14 (2016); *Exodus Refugee Immigr. Inc.*, 2016 WL 5682711, at *1.

64.     When it comes to safety risks, transgender people themselves are the group most vulnerable to harassment and violence in sex-separated spaces such as restrooms. *See* DE 23-10 at 9; DE 23-14. Thus, when a school requires a transgender girl to use the boys' restroom or force a transgender boy to use the girls' restroom, they put them at risk of physical, verbal, or sexual assault from other students or adults. Ex J. at 9.

65.     Lastly, protecting cisgender students' comfort is an illegitimate interest that cannot justify Resolution 2 or PRSD's new policy and practice.

66.     A transgender person's mere presence in a restroom does not violate the rights of cisgender individuals in those spaces. *See Dep't of Fair Emp't & Hous. v. Am. Pac. Corp.*, No. 34-2013-00151153, Order at 4 (Cal. Super. Ct. Mar. 13, 2014) (DE 23-11); *Lusardi*, 2015 WL 1607756, at *9. *Cf. G.G.*, 822 F.3d at 724 n.11; *Glenn*, 663 F.3d at 1321; *Cruzan v. Special Sch. Dist.*, No. 1, 294 F.3d 981, 984 (8th Cir. 2002). And what is more, for every student at Pine-

Richland High School that may feel uncomfortable using a shared restroom, "[t]he option also exists for any student to use a single stall bathroom." DE 23-23 at 2.

67.     To the extent Resolution 2 seeks to validate an objection to seeing transgender people—which is to say, to their mere presence—that is not a legitimate government interest that this Court will dignify. Similar claims of "discomfort" about simply sharing spaces with those perceived as different have been made throughout history, but never has the correct answer been to indulge that discomfort.

68.     Discomfort with transgender people, even when wrapped in the cloak of privacy or safety, is simply not a legitimate basis for imposing unequal or stigmatizing treatment.

**Plaintiffs are suffering and will continue to suffer irreparable harm absent the enjoinment of Resolution 2 and PRSD's new policy and practice.**

69.     By adopting new and discriminatory rules governing the use of restrooms by transgender students, Defendants have caused and continue to cause irreparable harm to Plaintiffs.

70.     As a result of the School Board's debate surrounding the use of restrooms by transgender students, the adoption of Resolution 2, and the implementation of PRSD's new policy and practice, Plaintiffs are suffering irreparable harm each passing day.

71.     Defendants' actions have caused and continue to cause Plaintiffs to suffer from distress, anxiety, discomfort, depression, and humiliation. Juliet Decl. ¶¶ 46-52, 54-55, 62; Elissa Decl. ¶¶ 28, 31, 34, 40; A.S. Decl. ¶¶ 24, 33-35, 40; G. Ridenour Decl. ¶¶ 39, 44; M. Evancho Decl. ¶¶ 18, 32, 35; *see also* Ehrensaft Decl. ¶¶ 37-38; DE 23-10 at 10-12.

72.     Plaintiffs also increasingly feel isolated, marginalized, and stigmatized by Defendants' actions. Juliet Decl. ¶¶ 38-39, 46, 48-49, 62; Elissa Decl. ¶¶ 36-37, 40; A.S. Decl. ¶ 35. They live in constant fear of being stigmatized for using a restroom that is not consistent with their gender identity and being referred to by his female birth name and pronouns—which could

lead to involuntary and consistent disclosure of their transgender status to others, harassment, or even violence. Juliet Decl. ¶ 58; Elissa Decl. ¶ 35; A.S. Decl. ¶ 35.

73.     Because of Defendants' actions, Plaintiffs have been compelled to not use the restroom at all while at school except when absolutely necessary, which causes them great discomfort and can lead to adverse health consequences. Juliet Decl. ¶ 50; Elissa Decl. ¶ 38; A.S. Decl. ¶ 36; *see also* Ehrensaft Decl. ¶¶ 37-38; DE 23-10 at 10-12.

74.     Defendants' actions have also caused Plaintiffs to fear for their safety and well-being. Juliet Decl. ¶¶ 40, 52, 54-55, 58; A.S. Decl. ¶¶ 38-39; M. Evancho Decl. ¶¶ 24, 28-29; *see also* Ehrensaft Decl. ¶¶ 37-38; DE 23-10 at 9-10.

75.     Defendants' actions have negatively affected Plaintiffs' schoolwork, just as they are in the process of deciding whether and where to go to college. Juliet Decl. ¶ 59; A.S. Decl. ¶¶ 30, 37; *see also* Ehrensaft Decl. ¶ 35. In the school context, even "diminished academic motivation" is sufficient to constitute irreparable harm. *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 853 (7th Cir. 1999).

76.     In addition, there is a presumption of irreparable harm when a plaintiff's constitutional rights or civil rights have been violated. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Rogers v. Windmill Pointe Village Club Ass'n*, 967 F.2d 525, 528 (11th Cir. 1992).

77.     When preliminary injunctive relief is requested to prevent the violation of constitutional rights, no further showing of irreparable injury is required. *See Murray v. Silberstein*, 882 F.2d 61, 64 (3d Cir. 1989) (quoting *Elrod v. Burns*, 427 U.S. 347, 373–75 (1976)). The violation of constitutional rights constitutes irreparable injury. *See Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007).

78.     Finally, Plaintiffs have no adequate remedy at law for the aforementioned harms. Irreparable harm is found where a final judgment would be insufficient to compensate for the harm caused by Defendants' actions.  *See Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.,* 735 F.3d 735, 740 (7th Cir. 2013); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992).

79.     Here, Defendants' have upended the status quo during Plaintiffs' last year of high school. *See Amalgamated Food Emp. Union, Loc. No. 590 v. Natl. Tea Co.*, 346 F. Supp. 875, 883 (W.D. Pa. 1972). Thus, even if, at the conclusion of this case, Plaintiffs were to prevail, there is no recovery that possibly could give back to Plaintiffs the loss suffered if they are forced to spend their senior year focusing on avoiding using the restroom, rather than on their studies, extracurricular activities, and college application process. *See Whitaker*, 2016 WL 5239829, at *4. No amount of damages can compensate Plaintiffs' for such harm.

80.     Plaintiffs will undoubtedly suffer serious and irremediable harm if the injunction is not granted. Final judgment at trial in their favor can never rectify the significant psychological, academic, and physical harm that Defendants' continued discriminatory actions would cause.

**The Balance of the Equities and the Public Interest Strongly Favor the Issuance of a Preliminary Injunction.**

81.     The balance of the equities favors granting a preliminary injunction.  The more likely Plaintiffs are to win, the less heavily the balance of the equities must weigh in their favor. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 729 (3d Cir. 2004).  Here, Plaintiffs have demonstrated a strong likelihood that they will ultimately prevail in their claims. Moreover, Plaintiffs have demonstrated that, absent preliminary relief, they will continue to suffer irreparable harms, including distress, stigma, anxiety, depression, decreased academic performance, and possible disciplinary actions—all during their irreplaceable senior year of high school.

82.     Defendants cannot point to any possible harms should the preliminary injunction be granted. Indeed, Defendants have admitted that transgender students have been able to use the restrooms consistent with their gender identity "for several years" and that they "are not aware of any inappropriate actions on the part of any student." DE 23-23 at 2.

83.     A factor that weighs in the balance of the equities is the goal of maintaining the status quo, which is defined as the last peaceable, uncontested status of the parties. *See Kos Pharm.*, Inc., 369 F.3d at 729. Plaintiffs' request is to return to the status quo, where for several years Defendants allowed transgender students to use the restrooms consistent with their gender identity. *See* DE 23-3 at 5; DE 23-5 at 35. This factor clearly weighs in Plaintiffs' favor.

84.     The public interest also strongly favors granting the requested injunction. Indeed, the public interest demands respect for both constitutional rights and effective education. *See Sypniewski v. Warren Hills Reg'l. Bd. of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002); *see also Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883–84 (3d Cir. 1997). The public interest also commands the firm enforcement of Title IX. *See Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993); *see also Highland Loc. Sch. Dist.*, 2016 WL 5372349, at *20.

**Plaintiffs Shall Not Be Required to Post a Bond**

85.     A court may waive the requirement to post a bond under Federal Rule of Civil Procedure 65(c) where no risk of monetary loss to the Defendants is shown. *See Frank's GMC Truck Ctr., Inc. v. General Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988). And even in instances where there is some risk of monetary loss, the amount of the bond is left to the discretion of the court. *Id.*

86.     This is not a suit involving a commercial or business dispute. Rather, an injunction against the governmental Defendants here restores the status quo that governed restroom access

for transgender students for years without incident. Restoring restroom access for these Plaintiffs during the pendency of this litigation poses no financial burden or cost, nor any risk of monetary loss, on the Defendants. (Indeed, the injunction actually may protect the School from separate action by the Department of Education to withhold federal funding for violation of Title IX—a benefit to the Defendants as well as the Plaintiffs while this litigation progresses.)

87.     Accordingly, the balance of the equities weighs overwhelmingly in favor of the plaintiff students seeking the injunction against their school and the Court specifically finds that the facts warrant invoking the rare and narrow exception to the bond requirement of Rule 65(c). *See Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 425-26 (3d Cir. 2010).

88.     For these reasons, the Court finds that Plaintiffs need not post a bond.

Dated on this 14th day of November, 2016.

Respectfully submitted,

  */s/ Omar Gonzalez-Pagan*

Tracie L. Palmer                       Omar Gonzalez-Pagan*
(PA 312098)                            (NY 5294616)
David C. Williams*                     LAMBDA LEGAL DEFENSE AND
(PA 308745)                                 EDUCATION FUND, INC.
KLINE AND SPECTER, P.C.                120 Wall Street, 19th Floor
1525 Locust Street                     New York, New York 10005
Philadelphia, Pennsylvania 19102       t: (212) 809-8585 | f: (212) 809-0055
t: (215) 772-1000 | f: (215) 772-1359  ogonzalez-pagan@lambdalegal.org
Tracie.Palmer@KlineSpecter.com
David.Williams@KlineSpecter.com        Christopher R. Clark*
                                       (IL 6236859)
                                       Kara N. Ingelhart*
                                       (IL6321949)
                                       LAMBDA LEGAL DEFENSE AND
                                            EDUCATION FUND, INC.
                                       105 West Adams Street, Suite 2600
                                       Chicago, Illinois 60603
                                       t: (312) 663-4413 | f: (312) 663-4307
* *Admitted pro hac vice.*             cclark@lambdalegal.org

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 14, 2016, I electronically filed the foregoing with the

Clerk of the Court for the for the U.S. District Court for the Western District of Pennsylvania

using the CM/ECF system and a copy was made available electronically to all electronic filing

participants.


                                        */s/ Omar Gonzalez-Pagan*
                                        Omar Gonzalez-Pagan

November 14, 2016