## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIET EVANCHO, ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil No. 2:16-01537 |
| v. ) | |
| ) | Judge Mark R. Hornak |
| PINE-RICHLAND SCHOOL DISTRICT, ) | |
| ET AL., ) | |
| ) | |
| Defendants. ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

The three high school student Plaintiffs are each transgender, and all are in their senior year at Pine-Richland (Pa.) High School ("High School"). ECF 43 at ¶ 15. Two of them, Juliet Evancho and Elissa Ridenour, each over eighteen years old, had "male" listed on their birth certificates when they were born.[1] That of the third Plaintiff, A.S. (also a high school senior, but not yet eighteen years old), said "female." For some time, Juliet Evancho and Elissa Ridenour have lived all facets of their lives as girls, and A.S. has done so as a boy.

---

\* In the evening hours of February 22, 2017, the United States Departments of Education and of Justice jointly issued a guidance letter ("2017 Guidance") that withdrew or revoked the Departmental interpretation of Title IX and a regulation relating specifically to school bathroom use by transgender students that was contained in two previous Departmental guidance letters, one of January 7, 2015 ("2015 Guidance") and the other of May 13, 2016 ("2016 Guidance"). *See* February 22, 2017 "Dear Colleague" Letter, *available at* https://www2.ed.gov/about/offices/list/ocr/lgbt.html. As discussed at length in Section IV of this Opinion, the Court has carefully reviewed and considered the 2017 Guidance. The Court has also conferred with counsel for all parties regarding the impact of that latest Guidance. Counsel provided the Court with their respective positions as to the effect of such Guidance on the claims and defenses asserted by the parties in this case and on the disposition of the Motions now pending before this Court, and each advised the Court that they did not find it necessary to file further supplemental papers.

[1] The Commonwealth of Pennsylvania has re-issued a birth certificate for Plaintiff Evancho that lists her sex as "female."

The Defendant School District ("District")[2] does not dispute that Plaintiffs identify as transgender, which means, among other things, that their gender identities are at odds with the sexes listed on their original birth certificates and with their external sex organs. ECF 38 at ¶ 2. It is undisputed that in all respects, the Plaintiffs have—at least for their high school years—lived every facet of their in-school and out-of-school lives consistently with their respective gender identities rather than their "assigned sexes."[3] Their teachers, school administrators, fellow students and others have treated the Plaintiffs consistently with their gender identities as they have lived and expressed them rather than according to their assigned sexes. ECF 36-4 at ¶¶ 25-26. According to the District, the Plaintiffs, except for purposes of excretory functions, are of the gender with which they identify, and the District treats the Plaintiffs' gender identities as their "sex" in all other interactions with the District. ECF 38 at ¶¶ 3, 4, 5, 9; ECF 36-5 at ¶¶ 12-14; ECF 73 at 73.

---

[2] The District, located in the northwestern segment of Allegheny County, Pennsylvania, is a public school district organized and existing under the Public School Code of 1949, as amended. ECF 43 at 20. It is governed by a nine-member elected Board of School Directors. ECF 43 at ¶ 21. Its chief educational officer is its Superintendent, who is a Commissioned Officer of the Commonwealth, and is by statute an *ex officio*, non-voting member of the School Board. 24 Pa. Stat. Ann. §§ 10-1078, 1081; ECF 43 at ¶ 23. The District has about 4,500 students in kindergarten through the 12th grade, which would mean that it has about 1,600 students in grades 9-12 at the High School. It is uncontested that the District is the direct and indirect recipient of federal educational funding. Title IX therefore covers the District's educational programs. ECF 38 at ¶¶ 40, 42, 43, 44; ECF 43 at ¶ 22. The named Defendants are the District and its Superintendent and High School Principal (both in their official capacities).

[3] Solely for simplicity of reference, and because it is the focus of all of the arguments advanced by the Defendants, the Court will use the term "assigned sex" to refer to the physical characteristics of the external sex organs of a person being referenced. As was Judge Nelson in the *Rumble* case, this Court is reluctant to use any descriptive term that can have the unintended effect of reducing any person on any side of any case to a label, but it nonetheless uses this terminology because the District's asserted rationale for Resolution 2 turns on that single human characteristic. *See Rumble v. Fairview Health Svcs.*, No. 14-2037, 2015 WL 1197415, at *2, n.1 (D. Minn. Mar. 16, 2015). The Court will use the term "transgender" to refer to individuals who have expressed and live a gender identity that is different from their assigned sex at birth. The Court recognizes that each of the parties contends that such terms may have other meanings in a variety of contexts beyond the discrete issues now before the Court.

The central issue now before the Court is whether the District acted in accord with federal law when it limited, by formal School Board ("Board") Resolution 2,[4] the common school bathrooms that these Plaintiffs may use to either (a) single-user bathrooms or (b) the bathrooms labeled as matching their assigned sexes. The Plaintiffs argue that the District's application of Resolution 2 to prevent them from continuing to use common student restrooms that conform to their gender identities violates both Title IX of the Education Amendments of 1972, and the Equal Protection Clause of the Fourteenth Amendment, in the former case by unlawfully discriminating against them based on their sexes, and in the latter case by impermissibly treating them differently than other District students based on their gender identities, and therefore their sexes. The relief Plaintiffs seek in their motion for preliminary injunctive relief is relatively narrow. They seek an order of this Court enjoining the District from enforcing Resolution 2 as to them and restoring the *status quo ante* as to how the District interacted with the Plaintiffs prior to the enactment of Resolution 2.

The Court concludes that the Plaintiffs have a reasonable likelihood of success on the merits of their Equal Protection claim but not on the merits of their Title IX claim. The Court will therefore grant in part the Plaintiffs' Motion for a Preliminary Injunction, ECF 22; ECF 24. The Court will deny without prejudice the District's Motion to Dismiss both of the Plaintiffs' claims, ECF 34.

---

[4] Resolution 2 provides:

> This resolution agreed to by a majority of the Board of Directors of the Pine-Richland School District indicates our support to return to the long-standing practice of providing sex specific facility usage. All students will have the choice of using either the facilities that correspond to their biological sex or unisex facilities. This practice will remain in place until such time that a policy may be developed and approved.

ECF 39 at ¶ 31.

**I.**

Court cases involve real people and real events. Facts matter,[5] so it is both worthwhile and important to note what the record now before the Court does and does not demonstrate.[6]

Plaintiff Juliet Evancho began to change her appearance and dress to that typically associated with a girl at around age 12 or 13. She began medically supervised hormone treatment at around age 16, and in 2015, at age 17, she publicly began living as a girl. During the 2015-16 school year, Ms. Evancho and her parents met with school officials regarding her gender identity as a girl, and those school officials were fully on board with treating her consistently with that identity. She says that the passage of Resolution 2 and its implementation as to her have caused her serious emotional and other distress, making her feel unsafe, depressed, marginalized and

---

[5] That we know for sure. Our Court of Appeals has squarely recognized that there may be a Fourteenth Amendment right to privacy in a partially clothed body where as a result of "fact-intensive and context-specific analyses" a court concludes that governmental action has resulted in the "public disclosure of highly personal matters representing the most intimate aspects of human affairs," and where what is publicly disclosed "involves deeply rooted notions of fundamental personal interests derived from the Constitution." *See Doe v. Luzerne Cty.*, 660 F. 3d 169, 176 (3d Cir. 2011). Thus, *Doe* stands at least for the proposition that this Court is obligated to consider the Fourteenth Amendment and Title IX interests advanced by the Plaintiffs, and the privacy interests advanced by the Defendants, in the context of the actual facts.

[6] Each party has submitted detailed declarations, proposed findings of fact and conclusions of law, principal and responsive briefs, and various supporting reports and documents, all of which form the basis for the recitations contained in this Opinion. Although the parties vigorously dispute the legal consequences of the factual record before the Court, the parties agree as to the overall content of that factual record, each having advised the Court that an evidentiary hearing was unnecessary. The parties agree that the Court may and should proceed on the record developed by the declarations and other record material advanced by the parties. Having reviewed that record, and having considered the matters advanced by able and thoroughly prepared counsel for all parties in more than five (5) hours of oral argument before the Court, along with detailed supplemental filings of the parties, the Court concurs that the record is sufficiently complete and detailed to proceed with the disposition of the pending Motions. To the extent such denomination is required, the facts and conclusions set forth at length in this Opinion constitute the Court's findings of fact and conclusions of law for purposes of Fed. R. Civ. P. 52.

In addition, the Court granted leave to several *amici curiae* authorizing them to file briefs in this case. All were in support of the position of the Plaintiffs. ECF 48; ECF 51; ECF 55. *Amici* included a group of medical professionals who focus on healthcare for transgender youths, ECF 48, a group of senior school administrators from school districts and state-wide educational agencies in 21 states and the District of Columbia, ECF 51, and two Pennsylvania organizations whose energies focus on advocating for the interests of LGBTQ youth. ECF 55. The Court is appreciative of the efforts undertaken by *amici* and their counsel, who have made helpful contributions to the record in this case.

stigmatized by, among other things, the School's requirement that she use only either the boys restrooms or the single-user restrooms at the High School.[7] ECF 24-2 at 46-52, 55, 62. Ms. Evancho's photo, which shows that her appearance is completely consistent only with the gender identity that she lives every day, is in the record at ECF 24-2 at ¶ 7.

Plaintiff Elissa Ridenour began to live her life as a girl at age 14, and she likewise began medically supervised hormonal therapy thereafter. In 2012, while in 8th grade, she and her parents met with school officials to advise them that she was living her life in all respects as a girl. The District officials stated that they would engage with her in that fashion. ECF 71-2. Ms. Ridenour is treated by the High School community as a girl, and—at least prior to the passage of Resolution 2—was fully accepted as a girl. She reports that Resolution 2 had essentially the same impact on her as does Ms. Evancho. ECF 24-3 at ¶¶ 28, 31, 34, 40. Plaintiff Ridenour's photo, which shows that her appearance is consistent only with the gender identity that she lives every day, is in the record at ECF 24-3 at ¶ 8.

Plaintiff A.S. and his parents met with school counselors in 2015 and advised them that he lived as a boy. The school counselors advised him that he would be treated as a boy within the school community, and he was. Beginning in his junior year at the High School, A.S. started using the "boys" restroom with no issues, and he was widely accepted as a boy by the school community. In 2016, he too began receiving medically-directed hormonal treatment, and he has now legally changed his given name to one traditionally used by boys. A.S. also asserts the same

---

[7] The District does not dispute the historical factual assertions in Plaintiffs' declarations, but does take issue with certain other assertions in them. These include those in which the declarant asserts either motives of the Board or certain statements which might imply a causal link between the passage of Resolution 2 and what the declarant says is its effect on him or her, or between the Resolution and a perceived negative change in the High School environment.

sorts of actual harm from the implementation of Resolution 2 as do the other Plaintiffs. ECF 24-4 at ¶¶ 24, 33-35.

The Plaintiffs have submitted the declaration of Dr. Diane Ehrensaft, a developmental and clinical psychologist who has declared that she has considerable educational and professional experience in the area of gender identity matters. ECF 24-5. Dr. Ehrensaft stated that what is reported by the Plaintiffs as to their gender identities, their life experiences, and the scope of the impact of that identity on their daily living is fully consistent with their having exactly the gender identities they say that they have and the way they live in all facets of their lives. The Plaintiffs' own unopposed declarations, and those of their parents, state the depth and consistency with which they live the gender identities they have expressed on the record here. Indeed, there is no record evidence that these Plaintiffs do not actually have the specific gender identities they relate to this Court (and as they related to, and were known by, the District Administration while Resolution 2 was under consideration), nor has the District advanced any arguments to that effect.[8]

The parties seem to agree that besides Plaintiffs, there are no other openly-known transgender students at the High School at this time. The District does not advance as a factual matter that there are any other students at any level in the District that have advised the District that they are transgender. ECF 73 at 83, 88. Thus, in terms of the real world, the passage of Resolution 2 and its current application would fairly be understood by the Plaintiffs, the District and everyone else paying attention to these matters as relating to these Plaintiffs and their use of

---

[8] From the perspective of the actual record before the Court, that would be a very, very hard case to make. The record reveals no basis to call into question the sincerity and actuality of the gender identities of the Plaintiffs or the reality that the greater school community has for some time recognized those gender identities.

6

common bathrooms. Such would have well been known to the Board and the District Administration as being the case. ECF 23-3 at 4.

As to the High School restroom facilities themselves, the parties agree that the student restrooms at the High School are well-maintained, well-lit, and provide locking doors for the toilets in both the girls and boys restrooms. There are partitions on the urinals in the boys rooms. ECF 23-4 at 40. The photos of the restrooms placed into the record demonstrate all of that to be the case. ECF 41-3. The parties agree that the nearly one dozen single-user restrooms arrayed around the High School are now open to any student at any time, including to any student that has a particularized privacy concern. ECF 38 at 35-39.

Until early 2016, there were no institutional issues with the participation of the Plaintiffs in any facet of daily life at the High School. The District, its educational staff, and apparently their fellow students, treated each of them in the very same way that their own families did—that is, consistently with their gender identities. The record reveals that the Plaintiffs appear to have as their principal goal living and attending school in about as unexceptional a way as is possible. It is not an overstatement to observe that on the record before the Court, there simply were no issues or concerns from the District's perspective as to the Plaintiffs' unlimited participation in all daily activities at school, and the District's faculty, staff and Administration were fully supportive of them. ECF 38 at ¶ 13. The most distinctive and illustrative evidence of this is that Juliet Evancho ran for Homecoming Queen in 2016, and she was elected by her peers to the "Homecoming Court" of finalists for that honor.[9] ECF 38 at ¶¶ 7; ECF 36-5 at ¶ 14.

---

[9] At graduation, the Plaintiffs will wear the academic garb that matches their gender identities, and the name and descriptive pronouns that Plaintiffs and faculty use daily in reference to them—which match those gender identities—will appear on their diplomas. ECF 38 at ¶¶ 6, 8.

In early 2016, apparently fueled by an inquiry from a parent of a student at the High School, ECF 38 at ¶ 20, the District's Superintendent addressed the restroom issue with the entire school community for the first time.[10] His message was pretty much one of "steady as it goes," ECF 43 at ¶¶ 28, 29; ECF 73 at 9, 78; ECF 23-23, in that the Plaintiffs had been participating, engaged members of the student body, and the District Administration had become aware that the Plaintiffs had been using the school restrooms that conformed with their gender identities for some time. ECF 23-5 at 57; ECF 43 at ¶¶ 17, 18, 19. This was consistent with how the Plaintiffs lived their lives day in and day out and with how the District treated them in every other respect.[11]

Throughout the summer of 2016, there were a number of discussions about the restroom topic at the District's regular public Board meetings and at publicly-held Board Committee meetings convened specifically as to these matters. One session included a presentation on gender identity by the professional staff at Pittsburgh's Children's Hospital.[12] ECF 38 at ¶ 30;

---

[10] The record reflects that the Board President received a petition signed by twelve resident taxpayers of the District dated March 1, 2016. The petition requested the District's response to fourteen (14) questions related to the use of District restrooms, showers and locker rooms by students relative to their "biological sex." ECF 36-14. The record also reflects that the Superintendent first briefed the Board on these matters in October 2015. ECF 36-8. The Superintendent says that he first learned of a transgender student using a bathroom consistent with his or her gender identity in the Fall of 2015, though such use had been occurring since the 2013-14 school year. ECF 23-5 at 57; ECF 36-4.

[11] The District Administration's decision to interact with these students as it did was fully consistent with what appears to have been the core message of the advice provided to the the School Board and the Administration by professionals at Children's Hospital of Pittsburgh. It also happens to be fully consistent with what is set out in the Plaintiffs' expert's declaration based on her professional education and experience.

[12] The PowerPoint slide deck of that presentation, ECF 23-7, explains that the professionals from Children's Hospital stated many of the same professional conclusions as did the psychological expert's declaration proffered by the Plaintiffs: transgender status is not a "disorder," nor is it a "choice" or changeable; those who are transgender can experience "gender dysphoria," which is a recognized medical diagnosis reflective of severe and unremitting emotional pain connected to unresolved tension between gender assigned at birth and gender identity; and transgender people pose no different or heightened risk of harm or danger to anyone else. ECF 43 at ¶ 7.

In support of their position, the Plaintiffs filed the declaration of Dr. Diane Ehrensaft, ECF 24-5, a clinical and developmental psychologist of some 35+ years professional experience and engagement. She declared,

8

ECF 23-15. The debate was highly engaged. The Board sought the advice of its experienced school solicitor as to legal issues related to these matters. Members of the public spoke at the meetings on these topics. Many, but not all, spoke in favor of the position ultimately enacted in what has been denominated School Board Resolution 2. ECF 38 at 24; ECF 36-4 at ¶ 10-11. According to the declarations submitted by the individual Board Members, a (if not *the*)

seemingly in line with the Children's Hospital presentation, that external sex organs are one (but by no means the only or most accurate) indicia of a person's sex and gender, that being transgender is not a "preference," that being transgender has a medically-recognized biological basis, and that it is an innate and non-alterable status.

The Defendants did not counter Dr. Ehrensaft's declaration with any testimonial offering. ECF 36 at 20, n.5. They did refer generally in their papers to an article which in summary reports that (1) the idea that sexual orientation is an innate, biologically-fixed property of humans is not supported by scientific evidence, (2) there are no compelling causal biological explanations for human sexual orientation, (3) sexual orientation in adolescents is fluid, (4) the concept that gender identity as an innate, fixed property of humans independent of biological sex is not supported by scientific evidence, (5) 6/10ths of 1% of U.S. adults identify as a gender that does not correspond to their biological sex, (6) there is weak correlation between brain structure and "cross-gender identification," (7) only a minority of children who experience "cross-gender identification" will do so into adolescence or adulthood, (8) there is no evidence that all children "who express gender-atypical thoughts or behavior should be encouraged to become transgender." *See* ECF 43 at ¶¶ 1-6, 13; L.S. Mayer, Ph.D. & P.R. McHugh, M.D. *Sexuality and Gender: Findings from the Biological, Psychological, and Social Studies*, THE NEW ATLANTIS: A JOURNAL OF TECHNOLOGY & SOCIETY, Fall 2016, at 7-9 ("Article").

The Court has reviewed the Article, even though it carries with it no indicia of admissibility into the evidentiary record under any provision of the Federal Rules of Evidence, nor alternatively, any other indicia of reliability. The Defendants were given the opportunity to make such showings and have not. ECF 44, 63. There is no record evidence of the degree of acceptance in the scientific literature of the Article, its methodology, findings, or the degree to which it was subjected to peer review. It also appears from the Article's Preface that it was not the result of specific empirical research under the direction of its authors, but was instead a "synthesis of research" by Dr. Mayer. Article at 4. There is also no record evidence that the Article was consulted or relied upon by the District in enacting Resolution 2, or that its authors were in any way consulted by the Board or District Administrators in those regards.

The District does not advance any reason as to why the summary conclusions in that Article, which appear to be at odds with not only what Dr. Ehrensaft opines, but also with what the medical professionals from Children's Hospital reported to the Board at a public meeting, should be given precedence in this case. What that Article appears to say at its core is that particularly as to younger people, the surveyed literature indicates that gender identity may well remain unsettled for a longer period of time than is posited by the Plaintiffs.

The record in this case is both robust and unequivocal—the Plaintiffs, who are in late adolescence/early adulthood, have gender identities that appear to be settled. They live consistently with those identities and only those identities, and the entire School community treats them accordingly. They have for some time been engaged in medical consultations and interventions that are consistent with those identities. There is no record evidence that the Plaintiffs were "encouraged" to "become" transgender. The record reveals, and the District does not contest, that they are transgender.

Finally, the Article's references to sexual orientation do not appear to have anything to do with this case. *Rumble*, 2015 WL 1197415, at *2.

9

prevailing concern raised by both those who spoke in favor of Resolution 2 and Board proponents alike was that a student would in essence masquerade as being transgender, and would then use a designated student restroom inconsistent with their assigned sex. This would all occur in an effort to visually examine the sex organs of other restroom users or to engage in some other blatant and malicious invasion of bodily privacy of those simply using the restrooms for their intended purposes. Board members also expressed concern that the partially clothed body of a student of a given assigned sex would be observed in a restroom by a student of the opposite assigned sex. No explanations were provided as to the circumstances of how or when that has, or would, actually happen. ECF 36-4 at ¶ 12; ECF 36-7 at ¶ 16; ECF 36-8 at ¶ 15; ECF 36-9 at ¶ 12; ECF 36-10 at ¶ 14; ECF 36-11 at ¶ 12. And the record of these discussions (including the declarations of Board Members and the parents of other students, as well as the transcripts of portions of the meetings, ECF 23-2 through 23-6), does not reveal that any such episode involving an imposter has ever occurred at the High School or in the District, nor was any reported episode in another school advanced to the Board.[13] ECF 23-3 at 4-7; 73 at 81.

At the end of its process,[14] the Board in a 5-4 vote passed Resolution 2, reversed how things had been happening for the past several years, and directed, among other things, that students must use either unisex bathrooms or the school bathrooms of their "biological sex." ECF 38 at ¶¶ 16, 17; ECF 39 at ¶ 31; ECF 43 at ¶¶ 30-31. The Board did not then, and to the

---

[13] One Board Member stated that she had been made aware that in early 2016 several students at the High School were uncomfortable because a transgender student had used the student restroom that was inconsistent with that student's assigned sex. ECF 36-7. Another Board Member reported that he was first aware of the presence of a transgender student earlier than that based on a report from his child. ECF 36-8.

[14] It also does not appear from the record that the Board received a formal educational recommendation from either the District's Superintendent or the High School Principal as to the necessity or appropriateness of the passage or implementation of Resolution 2 as to restroom use by these Plaintiffs. The Superintendent expressed his concern that what he identified to be an uncertain legal landscape could put the District's federal funding at risk if the District changed the *status quo* as to restroom use via Resolution 2. ECF 36-4 at ¶¶ 15-23.

10

Court's knowledge has not to date, defined the term "biological sex" by resolution, policy statement or other Board pronouncement (although the principal proponent of Resolution 2 stated he meant "sex assigned at birth"). ECF 23-4 at 6. Resolution 2 by its terms did commit the District to engaging in further study and some sort of undefined policy development and adoption going forward. District counsel advised the Court that to date no Board or District policy exploration, development or adoption activity in such regards has occurred or begun. ECF 73 at 116-120.

At oral argument, the District's counsel advised the Court that "biological sex" for purposes of Resolution 2 means the then-existing presence of a penis (boys) or a vagina (girls). District counsel was not in a position to authoritatively respond when asked by the Court what the biological sex would be, for Resolution 2 purposes, of someone born with indeterminate primary external sex organs. District counsel did note that if, for instance, a boy had lost his penis due to trauma or surgery, he would no longer "be a boy"—even if as a result, he had not acquired a vagina. ECF 73 at 116-118.

As of the passage of Resolution 2,[15] the Plaintiffs were required to stop using the common restrooms they had been using, and instead were required to begin using either the single-user facilities that had been opened to all students or the common restrooms matching their assigned sex but not their gender identities. Thus, in sum and substance, in the Pine-Richland School District, the Board has adopted a student bathroom policy that turns exclusively on the then-existing presence of a determinate external sex organ, no matter what other biological sex or gender markers may exist, irrespective of gender identity (even if as in the case

---

[15] A "Resolution 1" was also proposed, which would have maintained the *status quo* as to bathroom use by Plaintiffs. It failed on a 4-4 vote. ECF 23-4 at 22-23.

11

of the Plaintiffs, that gender identity is uncontested, and apparently persistent, consistent and medically and psychologically comprehensive), unrelated to how a student leads his or her life in all other respects, and irrespective of the manner in which the District treats that student for all other purposes. ECF 73 at 175-77.

The record does not reveal (1) the analysis by which the Board chose its specific line of demarcation (or even if the Board, acting as a board,[16] adopted this specific line of demarcation, or whether that was a position taken by District counsel during oral argument, ECF 73 at 176-77), (2) whether that line of physiological definition was based on medical, psychological, psychiatric, or other similar assessments,[17] or (3) how the District would as a practical matter assess the presence of such external anatomy in a disputed case essentially "on the spot," or how it would day to day assess the compliance by the hundreds of students at the High School with that directive. What District counsel did advise the Court was that drawing the line, then and there, was both necessary to enforce, and for the District to act consistently with, longstanding societal definitions of "biological sex," and to protect the privacy interests of students.[18] District

---

[16] One Board member stated in his declaration that "anatomical" sex was the dividing line for him, which he indicated was "sex assigned at birth." According to District counsel, that Board Member was the author of Resolution 2. ECF 73 at 177. But "anatomy" is more than that. For instance, Dr. Ehrensaft opined that there are an array of "anatomical" markers that must be considered in assessing both "sex" and "gender," including internal reproductive organs, internal and external morphological features, chromosomes, hormones and body chemistry.

[17] Based on the Court's review of the meeting transcripts in the record, no Board member offered any such bases. Those advocating for differentiation based on "biological sex" instead referred to what they articulated to be general societal history and what they described as common understandings as to bathroom use.

[18] District counsel even more precisely tied the line of demarcation to excretory functions and the presence of external sexual organs. ECF 73 at 73, 113-118. District counsel also confirmed that there were no findings by the Board that for the purposes of Resolution 2, "biological sex" meant anything more or less than "the primary sexual organs of the student involved." ECF 73 at 176. The record is silent as to any situation in which the excretory functions of any person in any High School restroom are or had been visually accessible to anyone else. *See* ECF 23-4 at 40 (Board member recounting that all bathroom usage by students is shielded from view).

In one parent declaration that specifically addresses privacy interests, the declarant notes that he was concerned about shielding his daughter's unclothed figure "from the view of strangers, *particularly* strangers of the opposite sex." ECF 38 at ¶ 23 (emphasis added). That wording may be quite significant, as the fair reading of it is

12

counsel advised the Court that in enacting Resolution 2, the Board was responding to the desires of a majority of the portion of the District's populace who attended and spoke at School Board meetings for such a change in District operations. ECF 23-3 at 27.

The transcripts of the relevant portions of the Board meetings leading up to the adoption of Resolution 2 do not reflect any findings by the Board (1) that the basis for the enactment and enforcement of Resolution 2 was to address actually occurring or actually threatened situations of student restroom use for impermissible or unlawful purposes by anyone, including students, masquerading as being transgender; or (2) that the Plaintiffs' restroom usage pre-enactment of Resolution 2 in any way actually interfered with the orderly operations of the High School, or imminently threatened to do so.

There is no record evidence that the Board actively discussed or considered any risk of harm to the *Plaintiffs* after Resolution 2's passage from Plaintiffs' use of common restrooms that conformed to their assigned sexes, but which were wholly contrary to their gender identities. The Board's discussions did reflect that it viewed the High School's single-user restrooms as an alternative available to the Plaintiffs that would fully address their restroom needs.

The parties agree that other than perhaps one report received by the High School principal in October 2015 from a student that "there was a boy" in the girls bathroom (apparently in reference to Plaintiff Evancho), followed by a parent inquiry along the same lines in early 2016, there have been no reports of "incidents" where the use of a common restroom by any one of the Plaintiffs has caused any sort of alarm to any other student, nor of any actual or actually

that for reasons important to both that student and her parents, not potentially being exposed to the view of *anyone* else is of significance. If that is the case, it would appear from the record that the District has done its duty by its maintenance of high-quality student restrooms with partitions and locking stall doors, as well as the provision of ten single-user restrooms open to all students throughout the High School building, all of which provide that level of complete personal seclusion.

13

threatened impermissible conduct by or toward any student. There is no record evidence that any Plaintiff ever did, or threatened to do, anything to actually invade the physical or visual privacy of anyone else in the High School.[19] There is no record evidence that any student ever had their "partially clothed body" exposed to any student of another assigned sex in a High School restroom, or that such was threatened or attempted. At oral argument, neither party advised the Court of any situation in the District or in a public school in Pennsylvania (or anywhere else) in which a transgender student's use of a public school student restroom matching that student's stated and experienced gender identity, but not their assigned sex, has led to any sort of misconduct or unlawful activity, nor any activity that actually invaded the privacy interests of any other student. And the District appeared to agree that its existing codes of student conduct would proscribe and as necessary punish any student that engaged in such maliciously improper conduct. Certainly the statutory law of Pennsylvania would appear to do so. *See* 18 Pa. Stat. Ann. § 5901 (open lewdness); § 7507.1 (invasion of privacy); § 3127 (indecent exposure).

When the Court asked District counsel at oral argument to set forth one or more concrete examples of how the Plaintiffs' resumed and then continued use of the restrooms consistent with their gender identities would actually lead to the invasion of concrete privacy interests in light of the factual record summarized above, which would include the potential exposure of a partially clothed student's body to a student of a different assigned sex, District counsel instead described

---

[19] The District argues that the Plaintiffs' restroom use prior to the Fall of 2015 was not known to or formally sanctioned by the District. That assertion is telling in and of itself: if that were the case, perhaps the most significant evidence that the Plaintiffs' restroom use was causing no harm or risk of harm to other students or the school environment was that it had been happening for several years without the District's officials becoming aware of it.

14

a fundamental societal interest in privacy and an essentially inviolate "zone of privacy" applicable in all cases beginning at the restroom door.[20]

District counsel then described that privacy interest by calling upon a hypothetical matching a personal experience from his own school days. District counsel recited that while in high school, he competed on the cross-country team. Due to the press of tight school time schedules, he would from time to time change from "school clothes" into cross-country togs while standing in the corner of the restroom at his school (which appears to be another school altogether). ECF 73 at 131, 143. Perhaps that reported anecdotal event can be treated by the Court as being a plausible historical recitation of life events. However, there is no indication that such an event has occurred in the District, and even assuming that it might in the future, there is no record evidence as to the comparable "tightness" of the time schedule at this high school necessitating such actions, and no record evidence of the unavailability of actual locker rooms for use as a locker room (or as to the physical set up of such locker rooms in terms of providing privacy to each locker room user). The District's counsel also advised the Court that some of the older student restrooms in the High School had somewhat lower toilet partitions, which while still occluding any view of the user of the enclosed toilet, could allow a student to grab onto the top of the partition and hoist themselves up in order to peer over the partition at another student. But District counsel also candidly advised the Court that they were aware of no reports of incidents in which such conduct actually occurred. ECF 73 at 80.

The parties agree that for all purposes other than restroom use, the District treats each of the Plaintiffs consistently with their stated and experienced gender identity, and it appears to the Court that it seeks to do so with appropriate sensitivity to their needs and interests and the needs

---

[20] In support of that proposition, District counsel cited to *Doe*, 660 F.3d 169, which is discussed at length below.

and interests of all students. The parties have advised the Court that each Plaintiff has already completed the required physical education programs, and none participates in interscholastic or intramural athletic endeavors that require the use of the High School's common use locker rooms. The District also vigorously stated at oral argument that it is not its intention, in any way, shape or form, to label the Plaintiffs as having a sex designation other than their stated gender identities, with the single exception being the one at the core of this lawsuit: the use of common restrooms.[21] ECF 73 at 12, 112.

All of the Plaintiffs, and the parents of Juliet Evancho and Elissa Ridenour, have stated in their declarations in considerable detail that—particularly in light of the persistent manner in which the Plaintiffs live their lives consistent with their gender identities, and consistent with how the District treats them in all other regards—the enactment and enforcement of Resolution 2 has and will continue to segregate them from their peers by changing the *status quo* as to their restroom use, and in doing so, will marginalize and stigmatize them based on their actual gender identities. The Plaintiffs in their supplemental declarations advise the Court that during and since the public discussions that led up to the passage of Resolution 2, they have been the subject of

---

[21] But that's what Resolution 2 does. According to District counsel at oral argument, all of the people regularly and ordinarily using the restroom labeled "boys restroom" would ordinarily be referred to as boys. As a matter of elementary logic, if Resolution 2 would steer Ms. Evancho, for instance, to the common restroom labeled "boys room," it is hard to see how that would not be labeling Ms. Evancho as a "boy."

In the same vein, given the privacy screening in the High School bathrooms, the one physical "part" of the Plaintiffs and everyone else present that would be screened from view would be the only thing the same as among them, and what everyone using the restrooms could actually see would be completely different as between the Plaintiffs and all the other users.

The District's counsel did not explain how that stark state of affairs would actually be an appropriate course, especially when contrasted with the record, which reveals that the Plaintiffs' use of restrooms matching their gender identities prior to the passage of Resolution 2 caused no such disruption. This new state of affairs would appear to do little to address any actual privacy concerns of any student not addressed by the physical layout of the bathrooms, but it would swiftly cause a dramatic, negative impact on these Plaintiffs. ECF 73 at 173-74. Simply stated, it appears that the Plaintiffs have a likelihood of proving that the approach advanced by Resolution 2 as to common restroom use would actually place Plaintiffs' interests at risk without benefitting other restroom users.

16

several episodes of what they believe to be untoward or harassing conduct by some other students based on their gender identities.[22] ECF 71-1; 71-2. This harm is made more acute, Plaintiffs say, by the fact that they had been using the restrooms matching their gender identities for some time without problems, that they are the only transgender students at the High School, and thus, the only students whose use of school facilities has been changed by the enforcement of Resolution 2. This, they say, has inherently made them the focus of that enactment. The District mounts no factual challenge to the Plaintiffs' recitations of harm.

Finally, the Plaintiffs are at a real risk of actual harm in the form of disciplinary action if they use the common restrooms that are consistent with their gender identities. At oral argument, the District's lawyers advised the Court that, if confronted with the continued use by the Plaintiffs of school restrooms that are consistent with their gender identities but inconsistent with their assigned sex, the Plaintiffs will be subject to application of the District's student disciplinary policy, up to and including suspension from school. The Court would also note, however, that the District Administration seems to be in no hurry to so harshly punish the Plaintiffs, and appears instead to have focused on enforcement practices based principally on consultation and counseling with the Plaintiffs and the Plaintiffs' parents. ECF 70-1; ECF 73 at 93, 102.

* * *

Having reviewed the extensive record summarized above, and for the reasons that follow, the Court concludes that the Plaintiffs have made a persuasive case that there is a reasonable likelihood that they will demonstrate (1) that the reasons and rationales stated by the District for

---

[22] For its part, the District's declarations show that when such matters were brought to the attention of the District Administration by or on behalf of a Plaintiff, they were immediately investigated in a serious way. ECF 70-1.

the enforcement of Resolution 2 do not support its application to school bathroom use by these three Plaintiffs when applying the standards that now exist under prevailing law. Therefore they have a reasonable likelihood of success on the merits of their Equal Protection claim (but not their Title IX claim); (2) that they have suffered and will continue to suffer immediate and irreparable harm; (3) that the balance of equities falls in their favor; and (4) that the public interest will be served by the grant of limited preliminary injunctive relief in their favor. The District's Motion to Dismiss both of the Plaintiffs' claims will be denied without prejudice,[23] and the Plaintiffs' Motion for the entry of a preliminary injunction will be granted in part, to the extent that the *status quo* pre-Resolution 2 will be restored as to the use of common restrooms by these Plaintiffs. The Defendants will be preliminarily enjoined from prohibiting these Plaintiffs from using the common restrooms they were using immediately prior to the enactment of Resolution 2—that is to say, the common restrooms consistent with their gender identities.[24] The Defendants will be further directed to at least maintain the manner in which they interacted with the Plaintiffs regarding their gender identities prior to the passage of that Resolution.[25]

---

[23] For all of the reasons stated in this Opinion, the Court concludes that for purposes of applying federal civil pleading rules, the Plaintiffs have made a more than sufficient "showing" in their Complaint of a right to relief under both Title IX and the Equal Protection Clause of the Fourteenth Amendment for purposes of withstanding a motion to dismiss. *Fowler v. UPMC Shadyside*, 578 F. 3d 203, 211-212 (3d Cir. 2009). That the Court does not at this juncture conclude that the Plaintiffs have a likelihood of success on the merits of their Title IX claim for preliminary injunction purposes means only that they have not passed over the bar for the entry of that extraordinary equitable remedy.

[24] There was some debate within the Board as to what the "*status quo*" was. *See* ECF 23-5 at 38. To be clear, for these purposes, it is the factual state of affairs that existed prior to the passage of Resolution 2. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Opticians Ass'n. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990).

[25] Preliminary injunctive relief to this extent is a remedy precisely tailored to the demonstrated harm. *Swann v. Charlotte-Mecklenburg Sch. Dist.*, 402 U.S. 1, 15 (1971).

18

## II.

The parties agree on the applicable legal standard for the grant or denial of preliminary injunctive relief. To prevail, the Plaintiffs must demonstrate that "(A) they are likely to succeed on the merits of their claims, (B) they are likely to suffer irreparable harm without relief, (C) the balance of harms favors them, and (D) relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, No. 16-3528, 2017 WL 393164, at \*6 (3d Cir. Jan. 30, 2017). In evaluating whether the party seeking an injunction is likely to succeed on the merits, courts do "not require that the right to a final decision after trial be 'wholly without doubt'; the movant need only show a 'reasonable probability' of success." *Id.*; *see also See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 21 (2008); *ADP, LLC v. Jordan Lynch*, No. 16-3617, 2017 WL 496089, at \*2 (3d Cir. Feb. 7, 2017). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* And "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

The core issue before the Court is whether there is a reasonable likelihood of success for the Plaintiffs on either or both of their federal claims—that the enforcement of Resolution 2 violates the Plaintiffs' rights as secured by the Equal Protection Clause of the Fourteenth Amendment or by Title IX. For the reasons that follow, the Court concludes that the Plaintiffs have made that showing as to their Equal Protection claim, but they cannot at this juncture do so as to their Title IX claim.

## III.

The Court will begin by addressing the Plaintiffs' likelihood of success on the merits of their Equal Protection claim.[26]

The Fourteenth Amendment Equal Protection Clause provides that no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This broad principle, however, "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). As a result, the Supreme Court has "attempted to reconcile the principle with reality" by prescribing different levels of scrutiny depending on whether a law "targets a suspect class." *Id.* Laws that do not target a suspect class are subject to rational basis review, and courts should "uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* By contrast, laws that target a suspect class are subject to heightened scrutiny. *See, e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

The Equal Protection Clause is fully applicable to this public school district established and maintained under the laws of the Commonwealth of Pennsylvania. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009); *see West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) (Fourteenth Amendment applies to local boards of education). The

---

[26] The Court will address this claim first because the Court concludes that the Plaintiffs have a reasonable probability of prevailing on it. Doing so is not inconsistent with the general directive that federal trial courts are to apply the doctrine of "constitutional avoidance" in order to decide cases on statutory rather than constitutional grounds. *See, e.g.*, *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 249, n.13 (3d Cir. 2005). That salutary rule applies in cases where the statute and the constitutional rule arrive at the same destination, and when they do, a court is to rely on a statutory basis for its decision. Here, the federal statutory claims focus on the interpretation of specific statutory and regulatory language, and the resolution of the asserted constitutional claims turns on the application of a distinct body of decisional law. In the Court's estimation those claims have opposing likelihoods of being successful at this time. Thus, this Court cannot "avoid" reaching the Constitutional claims in this case.

20

Defendants and the Board of School Directors are state actors for such purposes, and none contends otherwise.[27] Where the state by its conduct intentionally treats one person differently from another, or one group of people differently from another group, when they are similarly-situated in all other material respects, the governmental classification must be justified by a standard related to its nature.

As a preliminary matter, the Court concludes that on the record now before it, the Plaintiffs have shown that the District is treating them differently from other students who are similarly situated on the basis of their transgender status. *See Kazar v. Slippery Rock Univ. of Pa.*, No. 16-2161, 2017 WL 587984, at *5 (3d Cir. Feb. 14, 2017). The Plaintiffs are being distinguished by governmental action from those whose gender identities are congruent with their assigned sex. The Plaintiffs are the only students who are not allowed to use the common restrooms consistent with their gender identities.[28] Plaintiffs Evancho and Ridenour fully identify as girls and are identified by others as girls. Plaintiff A.S. fully identifies as a boy and is identified by others as a boy. That is how they live, and have lived, their lives in all regards, and they are otherwise treated as such. The District conceded at argument that in terms of the use of common student restrooms, Plaintiffs Evancho and Ridenour would be required to use the

---

[27] The District's Solicitor advised the Board that the Equal Protection Clause would be implicated in this case. ECF 23-4 at 10.

[28] Equal Protection claims require proof of discriminatory purpose, which includes state action in which the decision maker selected or reaffirmed a course of action at least in part because of its effects on an identifiable group. *Doe ex rel. v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543-45 (3d Cir. 2011). Here, there is a clearly identifiable small group adversely impacted by the application of Resolution 2 to them, coupled with the District's stated intention to impact them, based at least in part on its stated desire to do so after a public insistence that it do just that. Given that the lead up to Resolution 2's passage and its explained rationales in this case were to expressly change the rules (or at least settled practices) as to Plaintiffs' restroom use, and to do so based on a criteria that knowingly and consciously related to *their* gender identities, the Court has no difficulty in concluding that the Plaintiffs have demonstrated a likelihood that they can establish the level of purposeful discrimination underlying a valid Equal Protection claim. *See Romer*, 517 U.S. at 634 (noting that separation based upon a specific characteristic raises an "inevitable inference" of animosity toward those affected by the classification).

restroom labeled "boys," Plaintiff A.S. would be required to use the restroom labeled "girls," and they and everyone else using those restrooms would have the assigned sex that matches the sign on the door. But unlike every other student, the Plaintiffs would have to use restrooms where they are wholly unlike everyone else in appearance, manner, mode of living, and treatment at school. Resolution 2 therefore discriminates[29] based on transgender status. Just as other courts have recently concluded, for these analytical purposes, that discrimination based on transgender status in these circumstances is essentially the epitome of discrimination based on gender nonconformity, making differentiation based on transgender status akin to discrimination based on sex for these purposes. [30] *Glenn v. Brumby*, 663 F.3d 1312, 1316-17 (11th Cir. 2011); *Bd. of Educ. of Highland S.D. v. U. S. Dept. of Educ.*, No. 16-524, 2016 WL 5372349, at *15-17 (S.D. Ohio Sept. 26, 2016), *stay denied pending appeal, Dodds v. U.S. Dept. of Educ.*, 845 F.3d 217 (6th Cir. 2016) ("*Highland*"); *Carcano v. McCrory*, No. 16-cv-236, 2016 WL 4508192, *17 (M.D. N.C. Aug. 26, 2016).

Given that the classification at hand is the Plaintiffs' transgender status, the parties dispute which Equal Protection standard should apply. The District says that the lowest Equal Protection bar applies, that is the rational basis test. Under that test, the government classification passes muster so long as there is some rational basis for it. The rationale need not be one actually relied on by the governmental actor, and it need not have been thought of or articulated at the

---

[29] The Court uses the term "discrimination" to mean a choice by the District among and between groups of people. *Discrimination*, BLACK'S LAW DICTIONARY (10th Ed. 2014). Not all "discrimination" is unlawful, as that word means at its core the process of choosing. Whether that "choice" is legally permissible is the issue joined in this case.

[30] Our Court of Appeals has recognized in cases arising under Title VII of the Civil Rights Act of 1964 that discrimination or differentiation based on gender, and gender nonconformity, is discrimination based on "sex." *Betz v. Temple Health Sys.*, 659 F. App'x 137, 143 (3d Cir. 2016); *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 290 (3d Cir. 2009); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262-63 (3d Cir. 2001).

time. It is sufficient, say the Defendants, if a reviewing court can think of any rational basis supporting the challenged governmental action. *See Natl. Assoc. for the Advancement of Multijurisdiction Practice v. Simandale*, No. 15-3356, 2016 WL 3755782, at *7 (3d Cir. July 11, 2016) (citing *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)).[31]

The District cites two reasons in support of its position that the Court should apply rational basis review. The first is that neither the Supreme Court nor our Court of Appeals has specifically weighed in as to the applicable Equal Protection standard as to classifications based on transgender status. While that may be true, the existence of that decisional vacuum is not enough to resolve the question. First, that means that applying an Equal Protection standard other than rational basis in such a setting is not contrary to settled law, and second, when an issue is fairly and squarely presented to a District Court, that Court must address it. Dodging the question is not an option.

The second reason advanced by the District is that in *Johnston v. University of Pittsburgh*, 97 F. Supp. 3d 657 (W.D. Pa. 2015), another member of this Court ruled that the rational basis standard applies to distinctions based on transgender status. *Johnston* is of course informative to other members of the Court, but as the parties are well aware, it is not controlling. *Camreta v. Greene,* 563 U.S. 692, 709, n.7 (2011); *Wright v. Sun Trust Bank, Inc.,* 642 F. App'x

---

[31] This Court is not so sure that the Supreme Court has gone as far as the Defendants posit as to the "lightness" of the rational basis test. Even in cases applying the most deferential of standards, there has to be a relationship between the classification adopted and the object to be attained. Any law making a classification must advance a legitimate governmental interest and be rationally related to advancing that interest. *Romer,* 517 U.S. at 631. In cases where laws have survived even the most modest level of judicial review, the laws in question have been "narrow enough in scope and grounded in a sufficient factual context for [the court] to ascertain some relation between the classification and the purpose it served." *Id.* at 632-33. In *Romer*, decided three years after *Beach*, the Supreme Court cautioned that laws that classify people, irrespective of the personal motives of their drafters, raise the "inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.* at 634. This Court notes these matters to highlight its obligation to carefully consider and discern the connection between the governmental interests asserted and the means chosen to fulfill them.

23

144, 147 (3d Cir. 2016). *Johnston* also acutely recognized that cases involving transgender status implicate a fast-changing and rapidly-evolving set of issues that must be considered in their own factual contexts. ECF 38 at ¶ 28, 29. To be sure, *Johnston's* prognostication of that reality was profoundly accurate.[32] *Johnston,* 97 F. Supp. 3d at 668. As is noted at various points below, there are number of fundamental factual and legal differences between this case and *Johnston.* This case involves the issue of what deference is to be given to administrative interpretations of applicable regulations and *Johnston* did not. And as to the Equal Protection claims in each case, the record in *Johnston* as to the plaintiff's transgender status and defendant's recognition of it was different than in this case, as was the breadth of the issues before that court. The long and the short of it is that this is a different case than *Johnston* for a number of material reasons.

The Plaintiffs in turn approach this issue with a double-barreled argument. First, they say that in light of the factual record set out above, there simply is no rational basis for the enactment and enforcement of Resolution 2—at least not as it relates to the use of the High School's restrooms by the Plaintiffs. They contend that there has been no rational basis that can be identified that would insulate Resolution 2 from an Equal Protection challenge, and that in any event the rational basis test, applied in its most accommodating iteration, still requires something, and what there is here is a desire to change the school restrooms that the Plaintiffs had been using without any factual basis to conclude that doing so is necessary or even advisable.

---

[32] This Court does part company with *Johnston's* analysis that *Glenn* was limited to the concept of gender nonconformity, which was divorced from transgender status. The *Glenn* court considered the definition of "transgender" to equate to rather profound gender nonconformity. *Compare Johnston*, 97 F. Supp. 3d at 669, n.11, *with Glenn*, 663 F.3d at 1316. Also, as a factual matter, it appears that in *Johnston*, the record as to the degree to which the plaintiff in that case, and the university community, consistently acted in conformity with the plaintiff's stated gender identity was much more mixed than it is here. *Johnston*, 97 F. Supp. 3d at 671-72.

24

Beyond that, the Plaintiffs contend that the rational basis test is not the test to be applied to the classification enacted by Resolution 2. They say that a heightened standard, known as "intermediate scrutiny," which is applied to classifications based on sex, should apply here. When intermediate scrutiny is applied, "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *United States v. Virginia*, 518 U.S. 515, 531 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* at 533. The State must demonstrate that the challenged law serves "'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Id.* Furthermore, "the justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* Finally, the justification "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* In short, intermediate scrutiny requires that differential treatment be supported by an exceedingly persuasive reason, advance an important governmental interest and have a direct relationship to the important governmental interest furthered by it. *See id.* at 531-33.

The Supreme Court uses the following four factors to determine whether a "new" classification requires heightened scrutiny: (1) whether the class has been historically "subjected to discrimination," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); (2) whether the class has a defining characteristic that "frequently bears no relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985); (3) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) whether the class is "a minority or politically powerless." *Id.*

25

Against that backdrop, the Court concludes that an intermediate standard of Equal Protection review applies in this case. The record before the Court reflects that transgender people as a class have historically been subject to discrimination or differentiation; that they have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society; that as a class they exhibit immutable or distinguishing characteristics that define them as a discrete group; and that as a class, they are a minority with relatively little political power. ECF 23-12; *see Adkins v. City of New York*, 143 F. Supp. 3d 134, 138-41 (S.D.N.Y. 2015). Indeed, the documentary record advanced by the Plaintiffs, and not contested by the District, reveals that, as a class of people, transgender individuals make up a small (according to all parties, less than 1%) proportion of the American population. *Highland*, 2016 WL 5372349, at *16. As to these Plaintiffs, their transgender characteristics are inherent in who they are as people, which is not factually contested by the District. As to these Plaintiffs, and more generally as to transgender individuals as a class, that characteristic bears no relationship to their ability to contribute to our society. More precisely, the record reveals that the Plaintiffs are in all respects productive, engaged, contributing members of the student body at the High School. Thus, all of the indicia for the application of the heightened intermediate scrutiny standard are present here. *See Carcano*, 2016 WL 4508192, at *17; *Highland*, 2016 WL 5372349, at *16-17.[33]

---

[33] The Court recognizes that, in applying this intermediate scrutiny test, this Court comes out differently than the court did in *Johnston*. This Court believes as *Johnston* predicted might occur that the decisional law has developed further, and has done so rather swiftly. Further, many of the cases relied on in *Johnston*, as to a degree *Johnston* did itself, came to that conclusion based on the absence of precedent from either the Supreme Court or the relevant regional court of appeals squarely ruling on the question. *Johnston*, 97 F. Supp. 3d at 668-69. The Court is obligated to apply the Supreme Court's existing analytical tests for determining what Equal Protection standard is to be applied in a specific factual context and then come to a conclusion as to the test to be applied in that case, notwithstanding that the Supreme Court or the regional court of appeals has not yet weighed in. The Court also appreciated the professional candor of the District's counsel in recognizing at oral argument that this question, along with the question of what the word "sex" means for purposes of Title IX, were the "million dollar" questions. ECF 73 at 160, 162.

Moreover, as to these Plaintiffs, gender identity is entirely akin to "sex" as that term has been customarily used in the Equal Protection analysis. It is deeply ingrained and inherent in their very beings. Like "sex," as to these Plaintiffs, gender identity is neither transitory nor temporary. Further, what buttresses that conclusion is the fact that the school community as a whole treats these Plaintiffs in all other regards consistently with their stated gender identities, along with the reality that these Plaintiffs live all facets of their lives in a fashion consistent with their stated and experienced gender identities. These are all factors that have informed the judgments of other courts in applying the intermediate scrutiny Equal Protection analysis in the case of classifications involving transgender status, and in this Court's estimation, they apply here. *See Glenn*, 663 F.3d 1312; *Highland*, 2016 WL 5372349; *Carcano*, 2016 WL 4508192; *Adkins*, 143 F. Supp. 3d 134; *see also Heckler v. Mathews*, 465 U.S. 728, 744 (1984).

When measured against the legal standard for meeting the intermediate scrutiny test, the Court concludes that the Plaintiffs have a reasonable likelihood of success on the merits of their claim that the District has not demonstrated that applying Resolution 2 to Plaintiffs' restroom use actually furthers an important governmental interest.[34] Specifically, what is missing from the record here are facts that demonstrate the "exceedingly persuasive justification" for the enforcement of Resolution 2 as to restroom use by these Plaintiffs that is substantially related to

---

[34] One significant way in which this case is factually different from *Johnston* and *Carcano* is that those cases also addressed not only restroom use but also the use of locker rooms and shower rooms in a university setting. This case is more like *Highland*, in which the court noted the only issue before it related to restroom use by a single transgender student. *Highland*, 2016 WL 5372349, at *20.

Noting that difference in the factual settings between *Johnston* and *Carcano* (cases which came to opposite conclusions one to another as to the reach of Title IX) and this case does not mean that this Court concludes that those additional facility uses would or would not lead to a different result in an Equal Protection analysis. It means only that for many of the context driven reasons noted by Chief Judge Smith in *Doe*, facts are what drive the analysis of a Fourteenth Amendment privacy interest, which in turn necessarily affects whether a governmental reason articulated in the Equal Protection analysis meets the requisite analytical standard, be it rational basis or intermediate scrutiny.

an important governmental interest. An examination of the record before the Court demonstrates why that is the case.

First, such an application of Resolution 2 would not appear to be necessary to quell any actual or incipient threat, disturbance or other disruption of school activities by the Plaintiffs. There is no record of any such thing. Any arguable disruption to the daily activities of the District that is the result of the passage of Resolution 2 (or the discussions leading up to or resulting from it) would not be attributable to the Plaintiffs, and there is no record evidence of such.[35] Nor would the application of Resolution 2 appear to be necessary to address any such threat or disturbance by anyone else in the High School restrooms, as there is no record evidence of that, either.

Second, Resolution 2 would appear to do little to address any actual privacy concern of any student that is not already well addressed by the physical layout of the bathrooms. The District has stated that Resolution 2 is necessary to protect the privacy of students (presumably including the Plaintiffs), by which the District has stated it means the sanctity of excretory functions. The record simply does not reveal any actual risk (or even an actual risk of a risk) in such regards. The Court readily recognizes that the law acknowledges the existence of a generalized privacy interest and that the District has an obligation to protect the legitimate privacy interests of all students. Certainly the *Doe* decision referenced by the District recognizes that such an important privacy interest exists. *See Doe*, 660 F.3d at 176-77. But according to *Doe,* recognizing that interest's existence does not end the inquiry, since that interest, like any stated governmental interest, must be considered in the context of the "facts on the ground," not

---

[35] Although it should go without saying, any "disruption" tied to the Plaintiffs seeking to vindicate their rights in this case amounts to nothing more than the ordinary consequence of such litigation, which, in any event, is a Constitutionally-protected activity. *See NAACP v. Button,* 371 U.S. 415, 429-30 (1963).

only as a broadly stated goal, and *Doe* specifically rejected the application of any "bright line" test. *See id.* Unlike the situation in *Doe*, the facts in this case do not establish any threatened or actually occurring violations of personal privacy.[36] Although the record reveals some specific concerns driven by the reputed presence (and presence alone) of a Plaintiff in a restroom matching her gender identity, there is no record evidence that this actually imperiled or risked imperiling any privacy interest of any person. And as noted above, given the actual physical layout of the student restrooms at the High School, it would appear to the Court that anyone using the toilets or urinals at the High School is afforded actual physical privacy from others

---

[36] In *Doe*, the facts drove the rule our Court of Appeals applied. Here they are:

Two sheriff's deputies were swarmed by fleas while searching what appeared to be a crime scene. A decontamination unit was called. All did not go smoothly in setting it up, so the process was moved to a local hospital for decontamination efforts. An involved, flea-attacked female deputy was in the decontamination room there, and another female deputy was with her to examine her for fleas after the afflicted deputy had removed her clothes and taken a shower. The freshly-showered deputy could not find any towels, so she attempted to wrap herself in the thin paper that doctors use to cover their examination tables. Because it was really thin, when it stuck to her wet body it became either transparent or translucent. *Doe*, 660 F.3d at 171-73.

Then two male deputies opened the unlocked wooden door to the decontamination area and not only covertly (at least at first) observed the deputy who was nude, but videotaped what was going on in the decontamination area under the rubric of making a "training tape" as to decontamination operations. There was record evidence that the deputy's breasts and buttocks were exposed and observed by the filmmaking deputies. It also appeared that the video captured a tattoo on the deputy's back that inferentially revealed that she was involved in a lesbian relationship. That video tape ended up back at the station house, with descriptive commentary about the female deputy's anatomy included in the "soundtrack" to that video. *Id.* at 173-74.

After engaging in the requisite fact intensive and context specific analysis, our Court of Appeals had no trouble in concluding that there was at minimum a genuine issue of material fact as to whether the freshly-showered, tissue-paper wrapped, naked sheriff's deputy had a legitimate interest in her bodily privacy when she was both observed by male coworkers in that state, and then videotaped by them, with the video ending up on a public computer file in the sheriff's office (and labeled with the denominator "XXX's ass"). The *Doe* Court also focused on the real risk that the videotape could end up on the Internet. *Id.* at 177-78.

Despite the reality that there are no similar facts present in this case, the District tells this Court that *Doe* means that in all cases, there is a constitutional "zone of privacy" that starts at the door to a restroom, and whether there is an actual or actually threatened exposure of intimate bodily parts is irrelevant. *Doe* held no such thing. *Id.* at 176-77. What it does say is that there can be a constitutionally-protected privacy interest in not having parts of your body publicly exposed to others. What *Doe* also plainly held was that there were no "bright lines," *id.*, and it did not draw one at the restroom door or anywhere else. *Id.*

viewing their external sex organs and excretory functions. Conversely, others in the restrooms are shielded from such views.[37]

Third, Resolution 2 would not appear to have been necessary in order to fill some gap in the District's code of student conduct or the positive law of Pennsylvania in order to proscribe unlawful malicious "peeping Tom" activity by anyone pretending to be transgender.[38] There is no evidence of such a gap. The existing disciplinary rules of the District and the laws of Pennsylvania would address such matters. And as noted above, there is no record evidence of an actual or threatened outbreak of other students falsely or deceptively declaring themselves to be "transgender" for the purpose of engaging in untoward and maliciously improper activities in the High School restrooms.[39]

Fourth, such application of Resolution 2 also would not appear to be supported by any actual need for students to routinely use the corners of the restrooms for changing into athletic gear from street clothes. Even if pressed by such theoretical possibilities, it would appear to the Court that the dozen or so single-user restrooms sprinkled around the High School would easily

---

[37] Put directly, everyone using the toilets in the "girls room" is doing so in an enclosed stall with a locking door, and everyone using the toilets in the "boys room" is doing the same or is using a urinal with privacy screens.

[38] In *Carcano,* the Court noted that laws in North Carolina, similar to those existing in Pennsylvania, adequately dealt with potential "Peeping Tom" situations. *Carcano,* 2016 WL 4508192, at *3-4. Further, the record in that case revealed that there had never been any reported episodes of "imposter" transgender individuals entering a restroom anywhere in the entire University of North Carolina system, nor in any other educational institutions in that state. *Id.*

[39] To do so in a way that would place them on similar factual footing to the Plaintiffs would take quite a lot. It is undisputed that these Plaintiffs live their lives in all respects consistent only with their gender identities and not their assigned sexes. It is also undisputed that the District treats them that way, that their peers and instructors treat them that way, that their families treat them that way, and that they are in consultation with medical professionals as they undergo medical interventions to fully transition in all physiological respects.

For an "imposter" to take such steps would be an extensive social and medical undertaking. That would appear to the Court to be a really big price to pay in order to engage in intentionally wrongful conduct that is unlawful under state law and contrary to the District's stated expectations as to student conduct. The Court need not determine as a legal matter precisely where the line would fall between individuals who embody gender identities on the same terms as the Plaintiffs and individuals who are *ad hoc* imposters, but it can observe with confidence that a one-off, episodic declaration of transgender status in an effort to escape the consequences of engaging in nefarious bathroom behavior would not support a factual finding of transgender "gender identity" as is present in this case.

fit the bill for private changing. There is also no record evidence that any student uses, has used, or will use any common restroom outside of its structurally privacy-protected areas in any state of undress or for "excretory functions," which the District advised was the focus of Resolution 2.

In light of where the factual record leads, the Court must next examine the express rationales set forth by the District for applying Resolution 2 to the Plaintiffs' restroom use.

First, the declarations of the Board members recite that some of them had received word that several parents had, and others would, move their children to other schools if the Board did not enact a policy akin to Resolution 2. The District has submitted supporting declarations from several such parents confirming their actions or intentions in such regards. ECF 38 at ¶ 25, 36-13, 36-15. Additionally, the record reflects that there were members of the community who attended one or more Board meetings and voiced support for Resolution 2. ECF 73 at 102. The Court is certainly in no position to conclude that a school board should be inattentive to the expressed educational preferences of parents and students—they plainly should consider such matters in doing their important work as school directors. But that does not resolve the question, because like the Court, those same school directors have sworn fealty to the Constitution and laws of the United States and the Commonwealth of Pennsylvania. 24 Pa. Stat. Ann. § 3-321, § 10-1004. If adopting and implementing a school policy or practice based on those individual determinations or preferences of parents—no matter how sincerely held—runs counter to the legal obligations of the District, then the District's and the Board's legal obligations must prevail. Those obligations to the law take precedence over responding to constituent desires.[40]

---

[40] The District also stated that the implementation of Resolution 2 as to the Plaintiffs furthered a "fundamental right" of parents to raise children. ECF 73 at 144. It did not explain how or why such rights of other District parents are to take precedence over the same rights of Plaintiffs' parents, who very much desire that Plaintiffs use restrooms conforming to their gender identities. In some ways, this and some other of the District's arguments boil down to contending that Resolution 2 is a legally-permissible restriction on Plaintiffs' use of school bathrooms because more

31

The Equal Protection Clause of the Fourteenth Amendment is neither applied nor construed by popular vote. *Barnette*, 319 U.S. at 638-42; *see Obergefell v. Hodges*, 135 S. Ct. 2584, 2605-06 (2015).

Second, the District argues that the passage of Resolution 2 was the first "policy" of the District as to the use of student restrooms by transgender students, perhaps intimating that there was never a "*status quo*" to the contrary.[41] Though it appears that there was no written or School-Board-adopted policy as to restroom use by transgender students (or anyone else), that does not resolve the matter either. As a matter of custom and practice, these students have been treated consistently with their gender identities in all respects, and prior to the enactment of Resolution 2 that included their using the restrooms consistent with their gender identities for several years. ECF 23-5 at 55. Federal law, particularly in the constitutional arena, has long recognized that a persistently-applied custom or practice of a governmental actor is accorded the same legal heft as a formal, voted-upon, "written in the policy manual" directive. The record here certainly reveals such a consistent practice with respect to the Plaintiffs prior to the passage of Resolution 2. *See Estate of Martin v. U.S. Marshals Serv. Agents,* 649 F. App'x. 239, 245-46 (3d Cir. 2016).

Third, the District's counsel advised the Court that Resolution 2 was intended to place into concrete District policy certain societal norms and expectations about privacy as to bathroom use. ECF 73 at 86. In so doing, they say that the Board was responding to the desires of the public that elected them. ECF 73 at 102. Given the analytical construct directed by our

---

residents who spoke at School Board meetings desired that outcome than not. Historically, that has not been the basis upon which the application of Constitutional rights is to be determined. *Barnette,* 319 U.S. at 638-42.

[41] Of note, Resolution 2's text disclaims that it is a "policy," in that it says the "practice" it sets forth will "remain in place" until a "policy" is "developed." Also of note is that the record contains no factual underpinning for that Resolution's recitation that the District was "returning" to a "long-standing practice" of providing sex-specific facility usage.

Court of Appeals in *Doe*, however, the fact that such interests exist generally, or are long-standing, does not advance the analysis necessary here. There is insufficient record evidence that the steps already in place at the time of Resolution 2's adoption did not adequately and reasonably address them, or that there were any actual or actually threatened risks to any such privacy interests by the actions of these Plaintiffs.

Fourth, the District asserts that there should not be an issue here because any student may use the single-user restrooms sprinkled around the High School. The District has proposed that those single-user bathrooms therefore provide a "safety valve" of sorts for the Plaintiffs if they do not feel comfortable using the common bathrooms matching their assigned sexes, but inconsistent with everything else about them. The Plaintiffs, on the other hand, contend that those single-user restrooms also provide a "safety valve" for any other students who may have especially heightened privacy concerns for whatever reason. Given that settled precedent provides that impermissible distinctions by official edict cause tangible Constitutional harm, *Hassan v. City of New York*, 804 F.3d 277, 289-92 (3d Cir. 2015), the law does not impose on the Plaintiffs the obligation to use single-user facilities in order to "solve the problem." In these circumstances, that would compel them to use only restrooms inconsistent with their gender identities or to use the "special" restrooms. That is a choice directed by official edict, and it is not a choice compelled of other students. It is no answer under the Equal Protection Clause that those impermissibly singled out for differential treatment can, and therefore must, themselves "solve the problem" by further separating themselves from their peers.

This all leads to the conclusion that under the intermediate scrutiny standard, the Plaintiffs have established a reasonable likelihood of success on their Equal Protection claim. That is because on the facts now present in the record, the District has not demonstrated that

there is an exceedingly persuasive justification for applying Resolution 2 to common restroom use by the Plaintiffs that is substantially related to an important government interest, since there is insufficient record evidence of any actual threat to any legitimate privacy interests of any student by the Plaintiffs' use of such restrooms consistent with their gender identity, or that the set-up of the High School restrooms fails to fully protect the privacy interests of any and every student.[42]

Next, the Court must consider whether Plaintiffs have shown that they are likely to suffer irreparable harm absent injunctive relief[43] and whether the balance of harms tips in their favor. As discussed at length above, the Plaintiffs have set forth—in considerable detail and without factual contradiction by the District—the actual, immediate and irreparable harm that they are experiencing. Courts have long recognized that disparate treatment itself stigmatizes members of a disfavored group as innately inferior, *Heckler*, 465 U.S. at 739, and raises the "inevitable inference" of animosity toward those impacted by the involved classification. *Romer*, 517 U.S. at 621. Given that the Plaintiffs had been using the restrooms consistent with their gender identities for several years without incident, and are now by formal District directive the discrete group barred from doing so, it is not a long leap, nor really a leap at all, to give credence to the

---

[42] Even if the Court were to apply the District's preferred standard, rational basis review, it would likely come to the same conclusion as to Plaintiffs' likelihood of success on the merits. As discussed above, under rational basis review, the Court must "uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer*, 517 U.S. at 631. Here, measuring the factual record against the interests articulated by the District, it appears reasonably likely that Plaintiffs will demonstrate that Resolution 2 is not "narrow enough in scope and grounded in a sufficient factual context" to survive even that deferential standard, *id.* at 632.

[43] Differentiation that causes harm can be a violation of the Equal Protection Clause in and of itself, but it does not by definition rise to *irreparable* harm. It is, however, an important consideration in the preliminary injunction analysis. *See Constructors Assoc. of W. Pa. v. Kreps*, 573 F. 2d 811, 820, n.33 (3d Cir. 1978); *see also Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F. 3d 464, 484-85 (1st Cir. 2009); *Tutein v. Insite Towers, LLC*, No. 12-071, 2013 WL 309056, *4 (D.V.I. Jan. 25, 2013). *But see Beattie v. Line Mtn. Sch. Dist.*, 992 F. Supp. 2d 384, 396 (M.D. Pa. 2014); *Saint v. Nebraska Sch. Activities Assoc.*, 684 F. Supp. 626, 628 (D. Neb. 1988) (denial of equal protection is itself irreparable injury).

Plaintiffs' assertions that they subjectively feel marginalized, and objectively are being marginalized, which is causing them genuine distress, anxiety, discomfort and humiliation. ECF 73 at 173-74. This Court is in no position to downplay or minimize the nature or consequence of such harm or the likelihood that Plaintiffs will prove it. Its relatively unquantifiable nature makes the Plaintiffs' harm no less real.[44] In fact, that Plaintiffs' harm is intangible and therefore cannot later be readily remedied by monetary relief is what makes it "irreparable" for these purposes, and is what makes a preliminary injunction appropriate in this case.

On the other hand, it would appear that the grant of relief ordered by the Court here would cause relatively little "harm" in the preliminary injunction sense—if any harm at all—to the District and the High School community. The record reveals that there were no problems with the Plaintiffs' restroom use prior to the Board actions that led to the passage of Resolution 2. Moreover, the record shows that the physical layout of the bathrooms at the High School appears to fully protect any legitimate privacy interests of both the Plaintiffs and all other bathroom users. And it would appear that the state of affairs advanced by applying Resolution 2 to the Plaintiffs could actually risk further harm to their interests without benefitting the District or anyone else.

Finally, in light of the Constitutional import of the commands of the Equal Protection Clause, and in light of the minimal burdens that would flow from requiring the District to return to the mode of bathroom operations as to the Plaintiffs that existed prior to the passage of Resolution 2, which is the *status quo ante*, the public interest is furthered by the grant of a

---

[44] Courts have long recognized, for example, that a bare equal protection violation is sufficient to constitute an injury in fact for the purposes of establishing Article III standing because unequal treatment under the law is harm unto itself. *See, e.g.*, *Hassan*, 804 F.3d at 289, n.1 (explaining that the mere act of being singled out for unequal treatment by government edict is a judicially cognizable injury); *see also Northeastern Fla. Chap. Assoc. Gen'l. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

preliminary injunction in this case. Accordingly, the Plaintiffs' Motion for a Preliminary Injunction will be granted on the Plaintiffs' Equal Protection claim. *See Dodds v. U.S. Dept. of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (explaining that injunctive relief to protect constitutional rights is by definition in the public interest).

## IV.

The Court must also address the Plaintiffs' likelihood of success on the merits of their Title IX claim. Assessing the likelihood of Plaintiffs' success on that claim is much more complex as a legal matter, and as noted above, the Court concludes that Plaintiffs are not currently entitled to preliminary injunctive relief as to it.

Title IX proscribes discrimination based on sex in the provision of educational programs funded by or with the assistance of the federal government. 20 U.S.C. § 1681(a). To establish a *prima facie* case of discrimination under Title IX, a plaintiff must allege (1) that he or she was subjected to discrimination in an educational program, (2) that the program receives federal assistance, and (3) that the discrimination was on the basis of sex. *See Bougher v. Univ. of Pittsburgh,* 713 F.Supp. 139, 143-44 (W.D. Pa.1989) *aff'd,* 882 F.2d 74 (3d Cir. 1989). No party appears to contest that Title IX applies to the District and its decisions about its educational programs. ECF 43 at ¶ 3 (as to conclusions of law). As other courts have concluded, the use by students of school restrooms is part and parcel of the provision of educational services covered by Title IX, and neither party takes issue with that. *Highland*, 2016 WL 5372349, at *10.

The Plaintiffs argue that Title IX's prohibition of discrimination based on sex includes discrimination based on transgender status. They point to the fact that the federal Departments of Education ("DOE") and of Justice ("DOJ") have for several years taken the position in Departmental Opinion letters and other communications that discrimination based on "sex" for

36

Title IX purposes includes differentiation based on transgender status, and that differentiations that treat a student contrary to the sex that aligns with his or her gender identity is discrimination based on sex and is prohibited by Title IX.[45] *Carcano*, 2016 WL 4508192, at *11 (referencing a 2013 DOE statement to that effect); *see* ECF 23-18 at 7-8 (Oct. 26, 2010 communication from DOE Asst. Sec'y. for Civil Rights); ECF 23-19 at 5 (Apr. 29, 2014 communication from DOE Asst. Sec'y for Civil Rights), ECF 23-20 at 25 (Dec. 1, 2014 communication from DOE Asst. Sec'y for Civil Rights); *see also* ECF 23-21 (Dec. 15, 2014 communication from Atty. Gen.) (application of parallel provisions of Title VII to transgender status and gender identity).[46]

The Defendants on the other hand contend that Title IX's definition of "sex" does not go beyond a binary definition as between men and women, and that Title IX does not reach any differentiation based on gender identity or transgender status. They rely on both the decision in *Johnston* and the Supreme Court's stay in the *G.G.* litigation, *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F. 3d 709 (4th Cir. 2016), *stay and recall of mandate granted*, 136 S. Ct. 2442 (2016), *cert. granted in part*, 137 S.Ct. 369 (2016), for those propositions. The Defendants also appear to contend that any broader construction of Title IX would go beyond the intention of Congress at the time of its enactment.[47]

As to the interpretation of Title IX, its prohibition of discrimination based on sex is generally viewed as being parallel to the similar proscriptions contained in Title VII of the Civil

---

[45] This perspective is not precluded by the fact that Title IX does not textually provide that discrimination on the basis of transgender status is prohibited. *See Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 175 (2005) ("Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered.").

[46] These interpretations were not withdrawn by the 2017 Guidance.

[47] But that is not the beginning nor the end of the analysis necessary here, since as the Supreme Court observed in construing the reach of Title VII's prohibition of sex discrimination in *Oncale v. Sundowner Offshore Svcs., Inc.*, 523 U.S. 75 (1998), "[b]ut statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Id.* at 79.

Rights Act of 1964, which prohibits discrimination on the basis of "sex" in the employment context. These statutes' prohibitions on sex discrimination are analogous. *See, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617, n. 1 (1999) (Thomas, J. dissenting) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX.") (collecting cases); *see also Davis v. Monroe County Bd. of Educ.*, 526 U.S.629, 651 (1999) (applying Title VII principles in a Title IX action); *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 718 (4th Cir. 2016) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX."), *cert. granted in part,* 137 S. Ct. 369 (2016)*.* In many ways, Title IX's antidiscrimination provisions are written more broadly than those of Title VII. *See Jackson*, 544 U.S. at 175-76 ("Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition. By contrast, Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute.").

Courts have long interpreted "sex" for Title VII purposes to go beyond assigned sex as defined by the respective presence of male or female genitalia. For instance, numerous courts have held that Title VII's prohibition of discrimination on the basis of "sex" includes discrimination on the basis of among other things transgender status, gender nonconformity, sex stereotyping, and sexual orientation. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) (Title VII proscribes male-on-male sexual harassment); *Betz*, 659 F. App'x 137 (Title VII and gender stereotyping); *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883 (11th Cir. 2016) (sex discrimination includes discrimination against a transgender person based on gender nonconformity); *Glenn v. Brumby*, 663 F.3d 1312 (Title VII and transgender status); *Prowel*, 579 F.3d 285 (Title VII and gender stereotyping); *Kastl v. Maricopa Cty. Cmty. Coll.*

*Dist.*, 325 F. App' 492 (9th Cir. 2009) (Title VII proscribes discrimination against transgender person based on gender nonconformity); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) (Title VII and gender nonconformity); *Bibby v. Phila. Coca-Cola Bottling Co.*, 260 F.3d 257 (same); *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000) (transgender status); *Valentine Ge v. Dun & Bradstreet, Inc.*, 2017 WL 347582 (M.D. Fla. Jan. 24, 2017) (Title VII covers sex discrimination against a transgender person for gender nonconformity); *EEOC v. Scott*, No. 16-225, 2016 WL 6569233 (W.D. Pa. Nov. 4, 2016) (sexual orientation under Title VII); *Roberts,* 2016 WL 5843046 (Title VII and transgender status); *Fabian v. Hosp. of Cent. Conn,*, 172 F. Supp. 3d 509 (D. Conn. 2016) (same); *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 100 F. Supp. 3d 594 (E.D. Mich. 2015) (Title VII applies to discrimination claims of transgender people based on alleged gender nonconformity); *Finkle v. Howard Cty.*, *Md.*, 12 F. Supp. 3d 780 (D. Md. 2014) (Title VII and transgender status); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653 (S.D. Tex. 2008) (Title VII applies to sex stereotyping claim of transgender plaintiff); *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) (Title VII and failure to conform to sex stereotype); *Mitchell v. Axcan Scandipharm*, No. 05-243, 2006 WL 456173 (W.D. Pa. Feb. 17, 2006) (Title VII and failure to conform to gender stereotype by a transgender person); *but see Eure v. Sage Corp., 61 F. Supp. 3d 651 (W.D. Tex. 2014)* (neither Supreme court nor Fifth Circuit caselaw have held discrimination based on transgender status per se unlawful under Title VII); *Etsitty v. Utah Trans. Auth.*, 502 F.3d 1215 (10th Cir. 2007) (Title VII does not address transgender discrimination); *Johnston*, 97 F. Supp. 3d 657 (same and collecting prior contrary authority).

In light of the most recent, broader readings of the term "sex" both in the context of Title IX claims, *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, No. 16-943, 2016 WL 5239829 (E. D.

Wisc. September 22, 2016); *Highland; Carcano*; *see also Corral v. UNO Charter Sch. Network, Inc.*, 2013 WL 1855824, at \*5 (N.D. Ill. May 1, 2013); *K.S. b/n/f Neonda Necole Thomas v. Nw. Indep. Sch. Dist.*, 2015 WL 9319982 (E.D. Tex. Dec. 23, 2015), and as noted above by courts considering that term in relation to the corollary anti-discrimination provisions of Title VII, the Court concludes that the Plaintiffs have demonstrated a reasonable likelihood of showing that Title IX's prohibition of sex discrimination includes discrimination as to transgender individuals based on their transgender status and gender identity. But that is not the end of the inquiry in this case, and here's why.

By formal regulation, the Department of Education has stated that segregating school restroom and locker room/shower room facilities based on "sex" is not prohibited by Title IX so long as those facilities are fundamentally equal. 34 C.F.R. § 106.33 ("Regulation"). Facially, giving the term "sex" in both Title IX and the Regulation the same scope and meaning as the law requires, it would appear that the Regulation permits discrimination or differentiation on the basis of "sex" so long as it is in the context of the use of substantially equitable school bathrooms, showers and locker rooms. *See Si Min Cen v. Atty. Gen.*, 825 F. 3d 177, 193 (3d Cir. 2016) (citing *Powerex Corp. v. Reliant Energy Servs., Inc.,* 551 U.S. 224, 232 (2007)) (the same meaning is "normally" given to identical words in the same statute). Thus, one fair reading of the Regulation is that any "sex" discrimination otherwise made unlawful by Title IX, including as to transgender status or gender identity (assuming that such are swept into the coverage of Title IX), is nonetheless not unlawful if it is limited to the circumstances specifically considered by the Regulation. But even *that* conclusion is not as clear as it might seem.

Prior to their 2017 Guidance, the DOE and DOJ had jointly issued two letters interpreting the Regulation, one in 2015 and one in 2016. Those letters advised school districts that

prohibiting transgender students from using school restrooms that aligned with their gender identities amounted to unlawful sex discrimination under Title IX and was not shielded by the "safe harbor" provisions of the Regulation. ECF 23-17 (Jan. 7, 2015 communication from DOE Acting Dep. Asst. Sec'y. for Policy) ("2015 Guidance"); ECF 23-8 (May 13, 2016 "Dear Colleague" Letter) ("2016 Guidance"). Then, DOJ and DOE issued the 2017 Guidance withdrawing the 2015 and 2016 Guidance documents and stating that those federal agencies would no longer rely on the positions stated in them. Of note, the 2017 Guidance did not propound any "new" or different interpretation of Title IX or the Regulation, nor did the 2017 Guidance affirmatively contradict the 2015 and 2016 Guidance documents. It instead appears to have generated an interpretive vacuum pending further consideration by those federal agencies of the legal issues involved in such matters. *See* February 22, 2017 "Dear Colleague" Letter, *available at* https://www2.ed.gov/about/offices/list/ocr/lgbt.html.

This set of circumstances substantially complicates the issues here. In general, when an agency interprets its own regulation, that agency's interpretation is entitled to some level of deference under *Auer v. Robbins*, 519 U.S. 452 (1997). But here, the DOJ and DOE had put forth two consistent interpretations of the Regulations in 2015 and 2016, and they have now retracted those interpretations without replacing them via the 2017 Guidance. In light of that retraction, the Court cannot avoid considering which—if any—of the DOJ and DOE's Departmental Guidance documents and other communications related to Title IX and its application to transgender individuals would now be entitled to any sort of *Auer* deference.

In the Court's estimation, the answer to that deference question would depend in large part on the effect of the 2017 Guidance on the DOE/DOJ's prior interpretations. On one hand, the 2017 Guidance could be read as a simple rescission of the prior DOE/DOJ's 2015 and 2016

41

Guidance interpretations, which would mean there is now simply no relevant DOE/DOJ interpretation of the Regulation, and therefore nothing to consider deferring to. On the other hand, as a legal matter, the 2017 Guidance could itself be read as a new interpretation of the Regulation by its obviating the prior interpretations of those Departments. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 515 (1994) ("[A]n agency's interpretation of a statute or regulation that conflicts with a prior interpretation is 'entitled to considerably less deference' than a consistently held agency view.").

Those issues are made even more uncertain by the reality that the 2015 and 2016 Guidance documents were issued in the thick of the trial court and appellate litigation of *G.G.*, as was the issuance of the 2017 Guidance, which also impacts the course of the litigation in *Texas v. United States*, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016). In that case, Texas and some other states sought and were granted an injunction stopping DOE enforcement proceedings based on the 2016 Guidance. While an appeal to the Fifth Circuit is now pending in that case, the United States very recently moved to withdraw its motion for a stay at the Court of Appeals pending that appeal. *State of Texas v. United States*, 16-11534, Order (5th Cir. Feb. 10, 2017).

*Auer* deference to a federal agency's interpretation of its own regulation, such as the Regulation, is often inappropriate when the interpretation was issued essentially in furtherance of a litigation position. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988). From this Court's perspective, it would appear likely that both the 2015 and 2016 Guidance letters would fall (or would have fallen) within that rule given their issuance directly relative to the *G.G.* litigation. And given the timing of the issuance of the 2017 Guidance relative to the *G.G.* appeal, it would appear to be a virtually inescapable conclusion that its issuance coupled with its swift transmittal to the Supreme Court relative to the appeal in *G.G.* was intended by the United States

42

to affect the arc of the disposition of that appeal.[48] Thus in any event it would appear that giving *Auer* deference to any of those interpretations would be and would have been an uncertain proposition at best.

On top of all of that is the reality that the 2015 and 2016 Guidance letters were central to the Title IX holdings by the *Highland* and *Carcano* courts, and the interrelationship between the language of Title IX and the Regulation as addressed in the 2015 and 2016 Guidance letters was at the heart of the Fourth Circuit's decision in *G.G*, 822 F. 3d at 723-25. That the term "sex" should be uniformly construed throughout and as between Title IX and the Regulation was not disputed in *G.G.*, 822 F. 3d at 723. But a central point of disagreement between the majority and Judge Neimeyer in his dissent in *G.G.* was that while the term "sex" as used in both Title IX and the Regulation had to be given the same meaning in both provisions, if that were the case, the Regulation would appear to permit exactly the type of differentiation as to school bathroom/shower room/locker room use that had occurred in *G.G.* But then, the 2015 and 2016 Guidance letters had nonetheless stated this was unlawful under Title IX. It was that position to which the *G.G.* majority deferred. *Id.* at 723-24.

In light of all of that, what makes the current legal landscape even more unsettled is that the Supreme Court is currently poised to grapple with these very issues in *G.G.* Recall that in *G.G.*, a transgender student seeking to use the school restroom at his high school consistent with his gender identity had sued his local school board under Title IX. The district court initially denied a preliminary injunction that would have permitted him to use the restroom that was consistent with his gender identity. The Fourth Circuit reversed and remanded the case to the

---

[48] The United States is not a party to the *G.G.* case. On the evening the 2017 Guidance was issued, and one day before the Respondent's merits brief was to be filed in the Supreme Court, the Deputy Solicitor General transmitted a copy of the 2017 Guidance to the Supreme Court and asked that it be distributed to the Justices. It would therefore appear that the United States believes that the 2017 Guidance could materially impact that litigation.

43

district court, which then entered the preliminary injunction. *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 132 F. Supp. 3d 736, 738 (E.D. Va. 2015), *rev'd in part, vacated in part*, 822 F.3d 709 (4th Cir. 2016), *cert. granted in part*, 137 S. Ct. 369, 196 L. Ed. 2d 283 (2016); *G.G. v. Gloucester Cty. Sch. Bd.*, No. 4:15CV54, 2016 WL 3581852, at *1 (E.D. Va. June 23, 2016).

In August 2016, the Supreme Court granted a stay of the Fourth Circuit's decision in *G.G.*, granted the *G.G.* petitioner's motion for recall of the Fourth Circuit's mandate, 136 S. Ct. 2442 (2016), and then subsequently granted certiorari on two of the three questions presented. 137 S. Ct. 369 (2016). Those questions are:

- If *Auer* is retained, should deference extend to an unpublished agency letter that, among other things, does not carry the force of law and was adopted in the context of the very dispute in which deference is sought?

- With or without deference to the agency, should the Department's specific interpretation of Title IX and 34 C.F.R. § 106.33 be given effect?

*See* 137 S. Ct. 369. As noted above, the Deputy Solicitor General formally advised the Supreme Court of the release of the 2017 Guidance. As of the issuance of this Opinion, that Guidance has been circulated to the Justices for their consideration, and the Supreme Court has asked for additional briefing from the parties in *G.G.* specifically addressing how they contend the ·disposition of the appeal should proceed in light of the 2017 Guidance. *See G.G.*, No. 16-273, Feb. 23, 2017 Order, *available at* https://www.supremecourt.gov/search.aspx?filename=/ docketfiles/16-273.htm.

So where does this leave matters in this case? The 2017 Guidance, its impact on the rationales set forth in the 2015 and 2016 Guidance letters, the deference due any of them or other

non-revoked prior Departmental interpretations of Title IX, and the interrelationship between Title IX and the Regulation in terms of the consistency of the definition of the term "sex" as between them when applied to transgender students and their use of common school bathrooms—all coupled with the current proceedings at the Supreme Court—go to the heart of the Plaintiffs' ability to demonstrate a reasonable likelihood of success on the merits of their Title IX claim at this moment in time.

When the Supreme Court granted its stay and recalled the mandate of the Fourth Circuit in *G.G.*, that action was necessarily based on several conclusions by that Court as expressed in the necessary vote of a majority of its Justices: (1) that there was a fair prospect that the *G.G.* decision will be reversed, *see Maryland v. King*, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers), or that there was a "significant possibility" of reversal, *see Times-Picayune Pub. Corp. v. Schulingkamp*, 419 U.S. 1301, 1305 (1974) (Powell, J., in chambers); and (2) that the party seeking it—the party who bears the burden of showing that the decision below was erroneous—had demonstrated the existence of such "extraordinary circumstances" as are necessary to warrant a stay. *Graves v. Barnes*, 405 U.S. 1201, 1203 (1972) (Powell, J., in chambers).

Although the Supreme Court granted its stay before the 2017 Guidance was issued, the stay remains in effect, so this Court must consider the impact of the stay on the Plaintiffs' ability to demonstrate a reasonable likelihood of success on the Title IX claim.[49] Such consideration

---

[49] The Supreme Court's grant of review in *G.G.* relates only to the Title IX claim in that case, and therefore directly impacts only the analysis of the likelihood of success on the statutory claim here. The situation before Judge Schroeder in *Carcano*, where he concluded that the status of *G.G.* at the Supreme Court did not strip *G.G.* of decisional vitality in his deciding *Carcano*, is different from that present here. His is an inferior court in the Fourth Circuit, and he concluded that in the absence of the Fourth Circuit's *G.G.* judgment actually being reversed or vacated, he was nonetheless obligated to adhere to it in considering the Title IX claim in that case. *Carcano*, 2016 WL 4508192, at *13. Even so, by agreement of the parties in *Carcano*, all proceedings in that case have been stayed pending the Supreme Court's merits disposition of *G.G. See Carcano*, No. 16-236, Order (M.D.N.C. Dec. 16, 2016)

requires reconciling several competing legal standards in the context of conflicting legal analyses. First, a preliminary injunction is an extraordinary remedy and is not to be awarded as of right. Second, to support preliminary injunctive relief, a plaintiff needs to demonstrate a reasonable likelihood of ultimate success. Third, while it is hornbook law that the mere grant of discretionary review by the Supreme Court is not a prediction of that Court's merits decision, *see Schwab v. Dep't. of Corr.*, 507 F.3d 1297, 1298 (11th Cir. 2007) (*per curiam*), this Court recognizes that a stay by that Court of a lower court judgment occurs only in extraordinary circumstances, and only when the party seeking a stay has carried its burden of showing that the decision below was likely erroneous or that there is a "fair prospect" or "significant possibility" of a reversal of the lower court's judgment. In this Court's view, while that standard may not require a showing of the same heft as does prevailing on a motion for preliminary injunctive relief, the fact that the Supreme Court decided to grant a stay in *G.G.* does exemplify that a majority of that Court has concluded that the likelihood of a reversal is sufficiently strong such that halting the impact of the judgment below was necessary.

Added to that mix is the fact that the issues now on the table in the *G.G* appeal relate directly to the application of the directives of Title IX and the limitations of the Regulation in the context of the use of common school bathrooms by transgender students. Even assuming that the provisions of Title IX reach discrimination based on gender identity and transgender status within the rubric of "sex discrimination," the impact of the Regulation on that analytical construct is at the heart of the Fourth Circuit's opinion in *G.G.* and is at the center of the issues

---

(staying the case pending proceedings in *G.G.* at the request of the parties). This Court is in a different situation, as it is now called upon to determine whether the Plaintiffs have demonstrated a likelihood of success on the merits of their Title IX claim without the presence of binding Circuit precedent.

46

expressly and by necessary implication now before the Supreme Court in its review of the Fourth Circuit's now-stayed decision in *G.G.*

In that light, this Court simply cannot conclude that the path to relief sought by the Plaintiffs under Title IX is at the moment sufficiently clear such that they have a reasonable likelihood of success on the merits of that claim. Put plainly, the law surrounding the Regulation and its interpretation and application to Title IX claims relative to the use of common restrooms by transgender students, including the impact of the 2017 Guidance, is at this moment so clouded with uncertainty that this Court is not in a position to conclude which party in this case has the likelihood of success on the merits of that statutory claim.

The Court therefore concludes that the necessary showing of likely success on the merits on the Plaintiff's Title IX claim cannot be made at this juncture. Plaintiffs' request for preliminary injunctive relief on Title IX grounds will be denied.[50]

## V.

The Plaintiffs appear to the Court to be young people seeking to do what young people try to do every day—go to school, obtain an education, and interact as equals with their peers. The School Board's consideration of these matters appears to have been open, extended and

---

[50] In this Court's February 23, 2017 status conference with all counsel relative to the 2017 Guidance, the District's counsel took the position that the situation in the *G.G.* appeal and the issuance of the 2017 Guidance also affected the analysis of the Plaintiffs' Equal Protection claim. An examination of the decision of the Court of Appeals in *G.G.*, the questions presented for review by the Supreme Court, and the 2017 Guidance itself demonstrates that such is simply not the case. The Fourth Circuit's *G.G.* opinion did not address the Equal Protection claims in that case as the District Court had not resolved them. Thus, the grant of review of that decision at the Supreme Court is limited to the implications of the Regulation on the Title IX claims/defenses in the *G.G.* litigation and the degree of deference to be accorded Departmental interpretations of Title IX and the Regulation. Finally, not only does the 2017 Guidance not reference the Equal Protection Clause at all, it affirmatively advises that it is not intended to impact other provisions of law. More than that, for quite some time, it has been settled law that that "the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply." *Marbury v. Madison*, 5 U.S. 137, 178 (1803). Thus, the matters that at the moment cut against the grant of preliminary relief on the Title IX claim in this case do not allow this Court to avoid addressing the Equal Protection claims now squarely before it.

47

highly engaged. From all accounts, the District's professional educators have worked hard to treat all students, including the Plaintiffs, with respect and to provide all students with an excellent education in an inclusive environment. In doing so, they have sought to comply with the law as their own oaths require while fulfilling the directives of the School Board as embodied in Resolution 2. Their effort to navigate the confluence of the competing demands present here was considerable, and it is likely not the easiest task they have ever confronted. All counsel have put their respective client's best foot forward in their written and oral presentations, and have in all respects brought their "A game" to the task with thoroughness and professionalism.

The Court's holding here need not and does not decide other questions that will arise over time in other school settings or in other situations. What it does do is apply established legal principles to fundamentally undisputed facts to conclude that the Plaintiffs have shown a reasonable likelihood of success on the merits of their claim that the District's enforcement of Resolution 2 as to their use of common school restrooms does not afford them equal protection of the law as guaranteed to them by the Fourteenth Amendment.

An appropriate Order will issue.[51]

 s/ Mark R. Hornak           
Mark R. Hornak
United States District Judge

Dated: February 27, 2017

cc:   All counsel of record

---

[51] Consistent with Fed. R. Civ. P. 65(c), the Court will order that Plaintiffs post with the Clerk security in an acceptable form in the amount of $500. Given that the injunctive order here restores and preserves the *status quo,* and does so in a case not involving the expenditure of money by the Defendants in order to comply with this Court's Order, the need for security is minimal, and security in such amount is sufficient to fulfill the purposes for which it is required by law.